## GUGGENHEIM v. UNITED STATES.

### No. 46775.

Court of Claims.

April 5, 1948.

Plaintiff seeks to recover alleged overpayments of income tax for 1938 and 1939 in the principal sum of $10,093.11 plus interest paid on certain deficiencies. The claim is based on the retroactive provisions of Section 23(a), Internal Revenue Code, as amended by Section 121 of the Revenue Act of 1942, 56 Stat. 798, 819, 26 U.S.C.A. Int.Rev.Acts, page 187, which provides for the allowance as deductions of non-trade or non-business expenses paid or incurred for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

Defendant says plaintiff is precluded from maintaining this suit for the alleged overpayments 'by a written agreement making final and conclusive a determination by the parties in respect of plaintiff's tax matters for the years in question in conformity with a compromise disposition of a number of disputed items.

In the alternative defendant says that certain attorney's fees paid, and amounts paid as reimbursements to a loan company for premiums paid in prior years for insurance on plaintiff's life, were personal expenses and, therefore, not deductible under Section 121, supra.

## Special Findings of Fact

1. Plaintiff, a citizen of the United States and a resident of Washington, D. C., filed his individual income tax return for the calendar year 1938 with the Collector of Internal Revenue at Baltimore, Maryland, on March 15, 1939. The return disclosed a net income of $40,509.41 and a total tax liability of $6,050.36. A deficiency of $363.41 was assessed in April 1939, and the total amount due was paid in quarterly installments during the year 1939. In the return plaintiff claimed among other deductions from income the amount of $12,959.39 for hurricane loss to landscaped trees, $19,-444.10 for insurance premiums paid, and $3,000 for legal fees paid, the last two amounts being claimed as business expenses in connection with his interest in a trust estate.

2. Pursuant to the denial of substantially all the above deductions, conferences were held between plaintiff's representatives and revenue agents and members of the Technical Staff of the Internal Revenue Bureau, at which plaintiff's net income for 1938 was first determined at $74,-379.87, but later decreased to $67,655.02.

The latter computation resulted from plaintiff's concessions on other disputed items and the Government's allowance of $8,000 of the claimed hurricane loss.

3. Plaintiff filed his return for the calendar year 1939 on March 13, 1940, at Baltimore, Maryland, disclosing net income of $87,245.93 and total tax liability of $24,-103.08. That amount was paid in quarterly installments during 1940. In the return plaintiff claimed among other deductions from income $4,555.62 for legal fees paid, as a business expense in connection with his interest in a trust estate.

4. As a result of the denial of the deduction claimed in the 1939 return, conferences were held between plaintiff's representatives and revenue agents and members of the Technical Staff, at which the determination of plaintiff's net income for 1939 was first increased to $93,909.68 and later decreased to $91,297.16. The latter figure resulted from plaintiff's concession of the issue involving the attorney's fees and the Government's change of position on the taxable percentage of The Kennecott Copper Corporation dividends received by plaintiff in 1939.

5. Immediately following the final conference between plaintiff and his representatives and the representatives of the Technical Staff, the head of the Atlantic Division of the Staff, under date of May 5, 1941, transmitted a letter to counsel for plaintiff as follows:

"In re: M. Robert Guggenheim, Washington, D. C.
Years: 1938 and 1939.

Your proposal for settlement of the above-entitled matter has been accepted and, pursuant thereto, the deficiencies for 1938 and 1939 have been recomputed and are shown in the schedule of recomputation, a copy of which is enclosed.

There are also enclosed Forms 870-T. S., the original and two copies of which should be executed and returned promptly to this office, marked for the attention of C: TS: AD: PFC: JRY.

Upon receipt thereof and approval in behalf of the Commissioner, a copy of the completed agreement will be returned for your files."

6. The Form 870-TS with additions and changes, as forwarded to plaintiff read, insofar as here material, except for plaintiff's signature and date, as follows:

"Waiver of Restrictions on Assessment and Collection of Deficiency in Tax

In re: M. Robert Guggenheim, Washington, D. C.

Pursuant to the provisions of section 272 (d) of the Internal Revenue Code, [26 U. S.C.A.Int.Rev.Code, § 272(d)], and/or the corresponding provisions of prior internal revenue laws, the restrictions provided in section 272(a) of the Internal Revenue Code, and/or the corresponding provisions of prior internal revenue laws, are hereby waived and consent is given to the assessment and collection of the following deficiency or deficiencies in tax:

taxable year ended December 31,
1938 income tax in the sum of $ 9,256.91
taxable year ended December 31,
1939 income tax in the sum of 2,874.18
* * * * * *

amounting to the total sum of.. 12,131.09
together with interest thereon as
provided by law.

This Waiver of Restrictions is subject to acceptance by or on behalf of the Commissioner of Internal Revenue, on the basis of the adjusted liability as hereinabove proposed, and is to take effect as such only from the date said adjusted liability is accepted by or on behalf of the Commissioner as a basis for closing the case, and if not thus accepted will have no force or effect.

If this proposal is accepted by or on behalf of the Commissioner, the case shall not be reopened nor shall any claim for refund be filed or prosecuted respecting the taxes for the year (s) above stated, in the absence of fraud, malfeasance, concealment or misrepresentation of material fact, or of an important mistake in mathematical calculations; and the taxpayer also agrees: (1) to make payment of the above deficiency, together with interest, as pro-

vided by law, promptly upon receipt of notice and demand from the Collector of Internal Revenue, and not to file an offer in compromise respecting such liability; and (2) upon request of the Commissioner to execute at any time a final closing agreement as to the tax liability, on the foregoing basis, for said year (s) upon the provisions of Section 3760 of the Internal Revenue Code [26 U.S.C.A.Int.Rev.Code, § 3760].

[Sgd.]   M. ROBERT GUGGENHEIM
(Taxpayer),
2700 Macomb Street NW.,
Washington, D. C.
(Address)

Date May 6, 1941.  By ..................

NOTE.—The execution and filing of this waiver at the address shown in the accompanying letter will expedite the adjustment of your tax liability as indicated above. It is not, however, a final closing agreement under section 3760 of the Internal Revenue Code, and does not, therefore, preclude the assertion of a further deficiency in the manner provided by law should it subsequently be determined that additional tax is due, nor does it extend the statutory period of limitation for refund, assessment, or collection of the tax.

The two paragraphs preceding plaintiff's signature were not a part of the printed form but were typed on the form by the parties after an agreement was reached on the issues in controversy. The portion stricken out at the bottom of the form and reading "and does not, therefore, preclude the assertion of a further deficiency in the manner provided by law should it subsequently be determined that additional tax is due" was a portion of the printed paragraph on the Form 870-TS.

7. By letter dated May 6, 1941, counsel for plaintiff returned the signed Form 870-T. S. to the Bureau of Internal Revenue. The letter stated:

"In re: M. Robert Guggenheim, Washington, D. C.
Years 1938 and 1939.

Enclosed are the three copies of Form 870, this day signed by Colonel M. Robert Guggenheim, and dated.

It is noted from your letter that one copy of the completed agreement will be returned for our files.

Your cooperation will be appreciated in having this matter put through to final completion in as short a time as may be feasible in order to save the running of further interest. * * * "

The form was formally accepted for the Commissioner of Internal Revenue on the same date.

8. By letter dated May 7, 1941, the head of the Atlantic Division of the Technical Staff wrote plaintiff as follows:

"Reference is made to your proposal for settlement incorporated in a waiver of restrictions on the assessment and collection of deficiencies in income tax of $9,256.91 for 1938 and $2,874.18 for 1939.

Your proposal has been accepted on behalf of the Commissioner of Internal Revenue.

The tax liabilities for the above years are shown in the attached statement. The deficiencies in tax, of course, bear interest as provided by law. In due course you will receive a notice and demand for payment from the Collector of Internal Revenue for your district."

The letter enclosed detailed computations of plaintiff's agreed upon tax liabilities and deficiencies for 1938 and 1939.

9. The agreed deficiencies for 1938 and 1939 were formally assessed in May 1941 and were paid with interest on June 2, 1941.

10. On November 19, 1942, plaintiff filed a claim for refund of $7,805.10 and an amended return for 1938. The ground set forth in the claim for refund is as follows:

"The additional expense items now allowable as deductions, in view of Sec. 121 of Revenue Act of 1942, when given effect in a redetermination of the tax for 1938, prove an overpayment of tax for that year in the amount stated, $7,805.10. Amended return herewith shows the balance of 1938 tax due, after deducting tax paid at source of $7,865.58."

The amended return set up claimed deductions aggregating $20,621.40 for expenses paid by plaintiff in 1938 as follows:

One-third, or $1,697.49 of taxpayer's office expenses is attributable to business; and of this 38% pertains to taxables making deductible portion ... a8-

Att'y fees, prof. services in business matters, items fully taxable ...................... 1,750.00

Att'y fees pertaining City Bank Farmers Tr. $500.00 taxables being 10%, or............... 50.00

Att'y fees, pertaining Comm. Tr., Newark, N. J. $750.00, taxables being 9.6%, or...... 72.00

Ins. prems. paid for conservation of property held for production of income ............. 18,104.35

Total .................... 20,621.40

11. On November 19, 1942, plaintiff filed a claim for refund of $2,288.01 and an amended return for the year 1939. The ground set forth in the claim was the same as for 1938. The amended return set up claimed deductions aggregating $4,160.02 for expenses paid in 1939 as follows:

One-third, or $1,592.80, of taxpayer's office expense is attributable to business; and, of this, 43% pertains to taxables, making deductible part........... $ 684.90

Att'y fees, prof. services in business matters, items fully taxable ...................... 2,705.62

Att'y fees, pertaining Comm'l Trust Co., N. J., $1,750 taxables being 15.4% ................. 269.50

Att'y fees, pertaining real estate, Babylon, L. I., N. Y., all taxables ....................... 500.00

Total .................... 4,160.02

12. By letter dated November 12, 1943, the head of the Atlantic Division of the Technical Staff transmitted a letter to plaintiff as follows:

"In re: Years 1938 and 1939

Reference is made to claims for refund filed by you for the years 1938 and 1939. This action on your part is contrary to the provisions of agreement, Form 870–TS, executed by you in connection with the closure of the case, under which you bound yourself to take no action for recovery of any part of the taxes for said years.

The closing effected in this case was made in a spirit of conciliation and involved the making of concessions on the part of the Government which would not have been made under the situation as it now exists. This office has reexamined the file of the case and is of the opinion that were it not for the fact that the statute of limitations has run against the collection of a further deficiency, this office would be disposed to reopen the case since you are the initiating party. However, since the statute of limitations bars the collection of additional tax, this office concludes to stand by the agreement and insist upon compliance with its terms. In the event of litigation, your claim for refund will be defended not only through reliance upon the terms of the signed agreement but also, if and when necessary, upon the merits of the tax."

Formal notice of disallowance was transmitted to plaintiff on December 29, 1943.

13. The taxes which plaintiff seeks to recover in this action were paid by plaintiff in accordance with the terms of the agreement arrived at. The deductions here claimed were claimed in plaintiff's original income tax returns for 1938 and 1939 and were in controversy until the agreement was reached.

14. Plaintiff was not engaged in any trade or business in 1938 and 1939. His income consisted almost entirely of distributions received from his father's estate and from two trust funds.

During these years he received interest income at the rate of 3½ percent on an amount of $2,000,000 held in his father's estate and the income of two $2,000,000 trusts set up as hereinafter described. Plaintiff held no present or future interest

in right to possession of, nor control of, any part of the corpus of his father's estate but as cestui que trust in each of the trusts he had an equitable life estate in the corpus of each of them. Plaintiff's personal secretary took care of his personal and social affairs. His personal attorney advised and assisted him in inquiries and discussions with the various fiduciaries who had sole management and control of the corpus from which his income was derived, and also who could pay to or withhold from plaintiff, the income.

15. In 1938 and 1939 plaintiff's secretary and the business office which plaintiff then had, involved aggregate expenditures of $5,092.46 and $5,015.69, respectively. The duties of the secretary included handling of plaintiff's correspondence appointments, bank accounts, bills, preparing tax returns, making statements concerning financial yield of plaintiff's income, keeping a budget of expenses, etc.

The business expenses included salary of secretary, telephone bills, typewriter repairs, postage, stationery, and office rent. (Plaintiff at the time had an office in the National Press Building, at Washington, D. C.) A reasonable division of the office expenses is one-third applicable to affairs of a business nature relating to plaintiff's income and two-thirds applicable to plaintiff's personal and social affairs.

Thirty-eight percent of the one-third fractional office expense for 1938 related to plaintiff's taxable income, and therefore, a deduction from income was claimed in the amount of $645.05. For 1939, 43 percent of the one-third fractional office expense related to taxable income, and a deduction of $684.90 was claimed.

16. In 1938 and 1939, plaintiff paid his personal attorney aggregate amounts of $4,261.35 and $5,000, respectively. For 1938, plaintiff claims a deduction of $1,750 for attorney's fees incurred in the handling of matters pertaining to plaintiff's income from his father's estate. Plaintiff's interest in the estate was a claim against the executrix, his mother, for the equivalent of 3½ percent annual interest on $2,000,000. Plaintiff had no present or future interest in the corpus of the estate. His father had died in 1930 and left outright legacies to plaintiff's brother and sister, but left plaintiff the life income from a $2,000,000 trust fund to be set up by the executrix within ten years. All real estate was devised to the widow. The trust had not been set up prior to 1940, and pending its establishment, the executrix paid plaintiff 3½ percent interest on $2,000,000 as directed by the father's will, regardless of the income of the estate.

In 1938 practically all trust funds and legacies had been paid, with the exception of four, which were to the three children of testator, and a legacy of $1,500,000 to the Daniel and Florence Guggenheim Foundation. During the seven intervening years between the death of the testator in 1930, and the year 1938, there had been periods when the interest had not been paid. Certain creditors of the estate of plaintiff's father had served notice on the executrix that in their opinion there was a deficiency of assets to pay claims, and legal proceedings were threatened unless the executrix ceased making further distributions. She did cease making further payments, and later, on the improvement of market conditions, certain of the creditors' claims were paid, and the executrix resumed the payment of income.

Colonel Guggenheim, the plaintiff, consulted counsel relative to the 3½ percent interest coming to him under the provisions of the will. It appears that the legacies to the plaintiff's brother and sister were outright gifts and plaintiff felt that if there should be an abatement arising from the deficiencies of assets, it was to the advantage of plaintiff's brother and sister that the income should be as small as possible, and the corpus as large as possible, because they took the corpus tax-free, Federal and New York state inheritance taxes having been paid, while plaintiff's income or interest was solely income of 3½ percent.

Services rendered by plaintiff's counsel were for plaintiff's protection in connection with his income, and consisted of various conferences and negotiations with the attorneys of the estate, the executrix, and

192

others, together with expenses of trips to New York.

17. For 1938, plaintiff claims a deduction from income of $50 for attorney's fees paid for services in relation to a trust of which the City Bank Farmers Trust Company was trustee. This involved a trust of $2,000,000 set up by plaintiff's mother out of her own funds in 1932, for the express purpose of satisfying plaintiff's creditors. Certain creditors were to be paid in the order as set forth in the instrument. Thereafter the income was to be used in payment of certain other creditors of plaintiff, and then the remaining income would be paid to plaintiff in amounts and at times to be determined by the trustee. The trustee was granted the sole, complete, and unqualified authority to manage, change, or dispose of any part of the corpus of the trust. Mrs. Guggenheim, the mother, had put into this trust approximately $2,000,000 market value securities, being municipal bonds and tax-exempt. A large block of New York City stock was a part of the trust. The trustee had absolute control of the funds, and sold a substantial portion of this stock, without consultation with plaintiff. Plaintiff regarded the New York City stock as one of the best investments in the trust, it being tax-exempt, and he employed counsel to go to New York concerning this matter. Counsel had various conferences with the trustee and others. Of the amount paid plaintiff's attorney in 1938, $500 pertained to the trust, but since only 10 percent of the income of the trust was included in plaintiff's taxable income, plaintiff claims a deduction of $50.

18. For 1938 and 1939, plaintiff claims deductions from income of $72 and $269.50, respectively, for attorney's fees which pertained to a trust of which the Commercial Trust Company of New Jersey was trustee. For 1938, the attorney's fee pertaining to that trust was $750, but since only 9.6 percent of the trust income was includible in plaintiff's taxable income, the claim for deduction was $72. For 1939, the amount of the fee pertaining to that trust was $1,750, but since only 15.4 percent of the income was includible in plaintiff's taxable income, the deduction claimed was $269.50. The Commercial Trust Company trust was for $2,000,000 and was set up inter vivos by plaintiff's father in 1917, with the father retaining complete control. By subsequent amendments, the father's three brothers were appointed trust managers, the bank thereafter acting only as custodian and collecting and distributing agent for the income. The managers had absolute and sole authority to manage, change, or dispose of any part of the corpus of the trust and to pay to, or withhold from, plaintiff the income thereof. The trust ran for twenty-one years after plaintiff's death, but plaintiff had only a life interest in the income thereof. At the expiration of the trust, the corpus was to revert to the settlor's heirs. The attorney's services pertaining to the trust in 1938 and 1939 were in connection with an indemnity agreement by plaintiff and his son for the benefit of the trust managers.

Plaintiff's uncles, the managers of the trust, undertook to resign from their duties in 1938, without due legal formality. Since they were serving without compensation, plaintiff desired his uncles to remain as trustee managers, which would mean the saving of a considerable amount of money to the trust and would benefit him.

The proof is that the brothers had retained counsel to represent them, and plaintiff's son, who was a party to the matter, had counsel to represent him in these negotiations. Plaintiff's counsel conducted negotiations with the brothers and trustee and others, which resulted in an agreement by Colonel Guggenheim, the plaintiff, to indemnify his uncles in their continuance as managers of the trust.

Of the fee claimed deductible in 1939, $750 was a payment by plaintiff of fee due from the trust managers to their attorney, and the remaining $1,000 was paid to plaintiff's attorney.

The item appearing on the return for 1939 amounting to $269.50, covers the same transaction being charged with $1,750 taxable. The proof shows that the name appearing on the return in 1939 as "City

Bank Farmers Trust" was in error, and should be the Commercial Trust Company of New Jersey.

19. In 1939, plaintiff ascribed $500 of the fees paid to his personal attorney to services in connection with plaintiff's 800-acre Long Island wooded estate. Plaintiff's father had willed the land to plaintiff's mother in 1930, and shortly thereafter the mother conveyed the property by deed to plaintiff as a gift. During his lifetime plaintiff's father had donated a narrow strip of the property to the Long Island Park Commission for part of a new highway. Later the Park Commission bought an additional strip from plaintiff's father and convenanted that no additional land would be taken by eminent domain while the father or his heirs owned the property. Certain entrances and exits to this parkway were also reserved by Colonel Guggenheim's father, in his conveyance to the Park Commission. After plaintiff had acquired the property, the Park Commission desired a further strip of land, and offered plaintiff $100 per acre for the same, which was refused. Plaintiff employed counsel in this matter, who investigated the title and advised plaintiff as to his legal rights in all of the angles of the situation, including valuation of the exits and entrances to the parkway. The result of the negotiations was that plaintiff sold the desired 11.3 acres to the Park Commission for $11,300. The charge made here is for services in carrying on the negotiations and for other matters passed upon by counsel.

20. Plaintiff in the year 1932 was involved financially as a result of stock market transactions, and creditors were pressing him. The previous year plaintiff's mother had conveyed to plaintiff as a gift an 800-acre estate on Long Island, as set out in finding 19, free of incumbrances, but plaintiff had subsequently placed an incumbrance of $100,000 on the property.

Plaintiff's mother, Mrs. Florence Guggenheim, set up a trust in plaintiff's favor, naming as trustee the City Bank Farmers Trust Company of New York City for the purpose of paying plaintiff's indebtedness.

(See finding 17.) The terms of the trust were to pay to nine or ten certain named creditors of plaintiff the respective amounts due them, and the trust set forth the order in which the various claims were to be paid. Certain of the creditors refused to wait for their money to be paid in the order contemplated, and threatened legal proceedings against plaintiff.

Plaintiff employed counsel to try to arrange an adjustment of the difficulties, and after considerable negotiations counsel did arrange for the Bond Mortgage and Securities Company of New York to buy up all of the claims against plaintiff, except the $100,000 mortgage claim and except also a claim of about $59,000 due the estate of the plaintiff's father. This company required among other things, as a condition for this purchase of the claims against plaintiff, that plaintiff insure his life for an amount equal to, or slightly in excess of the amount of the obligations to be paid off. These policies were issued in the amounts of $25,000 and $50,000 and were canceled as the debts were reduced.

During 1937 or 1938 all of the debts involved in this transaction with the Bond Mortgage and Securities Company had been liquidated, and in 1938 plaintiff paid to the said company the amount of $12,947.35 for insurance premiums which the company had advanced to pay for the insurance on plaintiff's life.

In 1939 plaintiff reported nontaxable income from two life insurance companies, aggregating $1,739.16, of which $1,109.96 was reported as received upon surrender of policy.

Plaintiff also received an advance of a certain sum on his trust income from the Commercial Trust Company of New Jersey, for which the company required plaintiff to put up a life insurance policy as security. To meet this requirement, one of the policies no longer required by the Bond Mortgage and Security Company of New York was transferred from this company as security to the Commercial Trust Company of New Jersey, and plaintiff paid the trust company the sum of $1,402 as insurance premium.

194

In 1938 plaintiff also paid the sum of $3,755 to the Bond Mortgage and Securities Company as premiums on policies of insurance that survived the refunded debt for which they were given as collateral. This makes a total paid out by plaintiff for insurance premiums of $18,104.35.

21. The record contains no detailed proof of policies issued, as to issuing companies, or as to dates of issuance or cancellation. Plaintiff carried no other life insurance.

Errett G. Smith, of Washington, D. C., for plaintiff.

J. W. Hussey, of Washington, D. C., and Sewall Key, Acting Asst. Atty. Gen. (Robert N. Anderson and Andrew D. Sharpe, both of Washington, D. C., on the brief), for defendant.

Before JONES, Chief Justice, and HOWELL, MADDEN, WHITAHER, and LITTLETON, Judges.

LITTLETON, Judge.

Plaintiff sues to recover $10,093.11 income tax plus certain interest, alleged to have been overpaid for 1938 and 1939 by reason of the failure of the defendant to allow deductions for certain nontrade and nonbusiness expenses which were not allowable at the time plaintiff's returns were audited but which plaintiff claims are allowable now by reason of Section 121(a) (2) of the Revenue Act of 1942, 56 Stat. 798, 26 U.S.C.A.Int.Rev.Acts, page 187. The defense is not only on the merits but also on the ground of a settlement agreement entered into by the parties at the time deficiencies were determined for the two years.

Plaintiff filed returns for 1938 and 1939 which disclosed net income in the respective amounts of $40,509.41 and $87,245.93, and tax liability in the respective amounts of $6,050.36 and $24,103.08. In the return for 1938 plaintiff claimed deductions of $12,959.39 for hurricane loss to landscaped trees, $19,444.10 for insurance premiums paid, and $3,000 for legal fees paid; and in the return for 1939 claimed deductions of $4,552.62 for legal fees paid. After an examination by a revenue agent substantially all of the deductions mentioned were recommended for disallowance with a re-

sulting deficiency for each year. Plaintiff protested the proposed disallowance and thereafter conferences were held with plaintiff's representatives. A further investigation was made by a revenue agent. As a result of these discussions, the representatives of the Commissioner agreed to recommend for allowance a deduction in the amount of $8,000 for the hurricane loss in lieu of the $12,959.39 claimed by plaintiff. Plaintiff abandoned his contention that the other deductions claimed were allowable. The Commissioner's representatives also agreed to make an adjustment in plaintiff's favor on account of certain dividends. The result reached by the parties was an agreed net income for 1938 of $67,655.02 and for 1939 of $91,297.16.

Shortly thereafter, plaintiff's tax liability was recomputed for 1938 and 1939 on the income agreed to, showing deficiencies for each year. On May 5, 1941, the Commissioner's representative advised plaintiff that "your [plaintiff's] proposal for settlement" of the tax liability on the basis agreed upon had been accepted and enclosed a document, set out in finding 6, which provided for a waiver of the statutory restrictions on the assessment and collection of the tax and also provided inter alia that upon execution by plaintiff and approval by the Commissioner "the case shall not be reopened nor shall any claim for refund be filed or prosecuted respecting the taxes for the years above stated [1938 and 1939], in the absence of fraud, malfeasance, concealment or misrepresentation of material fact, or of an important mistake in mathematical calculations." Plaintiff signed the formal agreement May 6, 1941, and it was formally accepted on behalf of the Commissioner on the same day (findings 7 and 8). The deficiencies agreed upon were paid by plaintiff on June 2, 1941.

On November 19, 1942, after the enactment of the Revenue Act of 1942, which contained in Section 121 thereof provisions for the allowance of certain nonbusiness expenses as deductions and made such provisions retroactive for the years 1938 and 1939, plaintiff filed claims for refund for those years (findings 10 and 11), claiming that substantially the same deductions, except in the case of the hurricane loss,

which had been disallowed by the Commissioner, should now be allowed. On December 29, 1943, the claims were disallowed by the Commissioner on the ground that the execution by plaintiff of the document, set out in finding 6, and its acceptance by the Commissioner precluded the allowance of the claims for refund (finding 12). This suit followed.

While the defendant is now contesting the allowance sought both on the ground of the deductibility of the items in question under Section 121 of the Revenue Act of 1942, and on the finality of the agreement executed by the parties, we find it unnecessary to consider the first defense since we are of the opinion that plaintiff is precluded under the second defense from maintaining suit on these claims. At the time this agreement was made and executed there was a substantial controversy between plaintiff and the Commissioner as to the former's correct tax liability for 1938 and 1939. Prior to the time the document was executed, the Commissioner had disallowed not only the items involved in this suit but also another substantial item. After protest by plaintiff and conferences both in Washington and New York City, and after at least two investigations had been made by a revenue agent, the parties reached an agreement as to plaintiff's correct net income under the law as it then existed. Whether the agreement was reached as a result of a compromise, or as a result of concessions by both parties, is not important. The conclusion is inescapable from the evidence that there was a meeting of minds as to the final disposition of the case. When that occurred, the Commissioner recomputed plaintiff's tax liability and transmitted to plaintiff the settlement document wherein was set out a deficiency for each of the years. In transmitting that document to plaintiff at that time, the Commissioner stated that he was accepting plaintiff's "proposal for settlement," and also referred to the document as an "agreement" when executed by plaintiff and approved on his behalf. In returning the document after execution, plaintiff likewise referred to it as an "agreement." See finding 7.

We are convinced from the facts that the document which plaintiff executed and the Commissioner accepted was not a mere waiver of restrictions on assessment and collection of a deficiency of tax on usual Form 870, as plaintiff seems to urge. That form was used as a starting point but important additions and alterations were made in it to incorporate the full terms of the agreement. This was done "as a basis for closing the case." By that agreement the parties did much more than agree on the amount of plaintiff's tax liability, as is shown by the two paragraphs which were added to the stated form which they used as a vehicle to set up their agreement finally closing the case.

In language which we think is too clear to be misunderstood and which would be rendered meaningless if plaintiff's interpretation were to prevail, the agreement states: "If this proposal is accepted by or on behalf of the Commissioner, the case shall not be reopened nor shall any claim for refund be filed or prosecuted respecting the taxes for the years above stated, in the absence of fraud, malfeasance, concealment or misrepresentation of material fact, or of an important mistake in mathematical calculations." There is no contention that there was any fraud, malfeasance, concealment, misrepresentation, or mistake in calculation. How this could be interpreted other than to preclude plaintiff from filing a claim for refund or prosecuting this suit is difficult to understand.

Plaintiff says, however, that the agreement is lacking in mutuality for the reason that the Commissioner was left free to reopen the case and assess further deficiencies. We do not so interpret the document. It is true, as will be noted from the document set out in finding 6, that on the prescribed Form 870 there was a provision which expressly stated that the execution of the agreement "does not * * * preclude the assertion of a further deficiency in the manner provided by law should it subsequently be determined that additional tax is due," but when the parties prepared and executed the agreement here involved that provision was stricken. A reasonable interpretation of

the entire document is that what the parties sought to do was to close the case in such a manner that it could not be re-opened either for a refund or for the assessment of deficiencies except in the case of fraud, malfeasance, etc. We see. no reason for interpreting the document otherwise. That a closing agreement under Section 3760 of the Internal Revenue Code, 26 U.S.C.A.Int.Rev.Code, § 3760, might have been entered into is not conclusive on the question whether the results which the parties desired to accomplish could not as well have been accomplished through the agreement which they here executed.

The case of Botany Worsted Mills v. United States, 278 U.S. 282, 49 S.Ct. 129, 132, 73 L.Ed. 379, upon which plaintiff relies, involved an agreement of settlement which the Court held did not preclude the reopening of the case upon a claim for refund. However, that case is easily distinguishable from the case at bar. In the Botany Worsted case the agreement was informal and oral in character and was agreed to only by subordinate officials in the Internal Revenue Bureau. There was no formal approval by or for the Commissioner. Many of the elements in the formal agreement involved in this case were lacking in that case. Moreover, we do not understand that case to hold, as plaintiff contends, that under no circumstances will a closing agreement be held binding unless executed in accordance with Section 3760 of the Internal Revenue Code (and a prior similar statute). In discussing the finality of such agreements the Court said:

"And, without determining whether such an agreement, though not binding in itself, may when executed become, *under some circumstances,* binding on the parties by estoppel, it suffices to say that here the findings disclose no adequate ground for any claim of estoppel by the United States. [Emphasis supplied.]"

At the time the agreement in this case was executed the statute had not run on the collection of further deficiencies, but when the claims for refund were filed the statute had run. It would obviously be inequitable to allow the plaintiff to renounce the agreement when the Commis-sioner cannot be placed in the same position he was when the agreement was executed. A clear case for the application of the doctrine of equitable estoppel exists and should be applied. Cf. R. H. Stearns Co. v. United States, 291 U.S. 54, 54 S. Ct. 325, 78 L.Ed 647.

The same result was reached in Baldwin v. Higgins, decided by the United States District Court for the Southern District of New York, June 23, 1937 [not officially reported but set out in American Federal Tax Reports, Vol. 19, page 1341] and affirmed by the Circuit Court of Appeals for the Second Circuit, 100 F.2d 405. A similar modified Form 870 was involved though an even stronger case there existed for the taxpayer for the reason that the portion of the form with respect to the assertion of a further deficiency which was stricken in the case at bar was not stricken in that case. In that case the Court stated:

"The waiver and consent agreement (Form 870, Exhibit 'G') is a binding contract and it was accepted and acted upon by the Commissioner. (R. H. Stearns v. United States, 291 U.S. 54, 61, 62, 54 S.Ct. 325, 78 L.Ed. 647; Backus v. United States, Ct.Cl., 59 F.2d 242; Walker v. Alamo Foods Co., 5 Cir., 16 F.2d 694)."

Some support for plaintiff's position is found in Joyce v. Gentsch, 6 Cir., 141 F.2d 891, 895, where a similar Form 870 was involved and plaintiff was allowed to reopen the case. However, in that case the portion stricken from the form in this case was not stricken, and the Court in its opinion stated: "The right to assess a further deficiency was expressly reserved."

In Ross v. United States, Ct.Cl., 75 F. Supp. 725, we held that where a taxpayer files a petition with the Tax Court and a judgment thereon becomes final, he cannot thereafter file a claim for refund and obtain the benefit of the retroactive statute with which we are concerned even though the statute has not run on the filing of a claim for refund. In this case instead of filing a petition with the Tax Court, plaintiff waived his right to go to the Tax Court consented to the assessment of the deficiencies, and in effect entered into an agreement which effected a finality similar to that which would have obtained had he

gone to the Tax Court. We can find no reason that would support the conclusion that Section 121, supra, was intended to apply in a case such as this.

In view of the foregoing, we find it unnecessary to consider whether the so-called nonbusiness expenses claimed by plaintiff are deductible. We have, however, made findings with respect to their general nature since these were the expenses which were likewise in controversy before the formal settlement agreement was executed and illustrate the many ramifications of plaintiff's activities which were before the Commissioner at that time. Plaintiff's contention that the Commissioner in his consideration of the claims for refund conceded that the items were deductible under Section 121 of the Revenue Act of 1942 is without merit. On the contrary, after the claims were filed, the Commissioner gave plaintiff notice that he would contest the claims not only on the basis of the agreement but also on their merits, and that was done.

Plaintiff is not entitled to recover and the petition is dismissed. It is so ordered.

HOWELL, MADDEN, and WHITAKer, Judges, and JONES, Chief Justice, concur.