William H. GROSSMAN and Carolyn S. Grossman, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 01–139 T.

United States Court of Federal Claims.

July 18, 2003.

---

Curtis W. Berner, Larkspur, CA, for plaintiffs.

Ellen Chesney Specker, Tax Division, U.S. Department of Justice, Washington, D.C., for defendant, with whom was Assistant Attorney General Eileen J. O'Connor.

## OPINION

ALLEGRA, Judge.

In this refund suit, pending before the court on cross-motions for summary judgment, one of the plaintiffs voluntarily agreed with the Internal Revenue Service (IRS) to resolve his tax liabilities, thereby avoiding the assertion, *inter alia*, of certain penalties and other additions to tax. Years later, after the statute of limitations on making new assessments for the tax years in question had run, that same taxpayer filed the instant suit with his wife, contending that the prior agreement was signed by the wrong IRS official and is void. As a result, plaintiffs assert, any assessments based upon the defective agreement are also invalid, thus entitling them to a refund of the taxes that were the subject of those assessments. In the law, however, that which appears to be too cute, usually is—and this case is no exception.

## I. FACTS

Plaintiff William Grossman invested in two partnerships: Cortlandt Associates (Cortlandt) and Gatsby Associates (Gatsby); Gatsby, in turn, held an interest in a third partnership, Bluegrass Associates '82 (Bluegrass). Plaintiffs filed joint federal income tax returns for the tax years in question (1982 through 1984), reporting Mr. Grossman's distributive share of his asserted losses from Cortlandt and Gatsby, as follows:

| Tax Year | Cortlandt Loss | Gatsby Loss |
|---|---|---|
| 1982 | $242,518 | $53,122 |
| 1983 | $15,215 | $12,674 |
| 1984 | $8,348 | $7,620 |

For these years, Cortlandt, Gatsby, and Bluegrass were subject to the partnership audit provisions of section 6221 of the Internal Revenue Code of 1954 (26 U.S.C.), as amended by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub.L. No. 97–248, 96 Stat. 324. On December 8, 1986, plaintiffs filed an amended return for 1982, reflecting the anticipated disallowance by the IRS of the losses from Cortlandt and Gatsby claimed in their original return. The

amended return reported an additional tax liability of $59,593, attributable to the disclaimed losses, which plaintiffs paid on December 30, 1986.

On August 6, 1990, the IRS mailed a notice of Final Partnership Administrative Adjustment (FPAA) to the tax matters partner (TMP) of Bluegrass, asserting increases in the income reported by that partnership for tax years 1982 through 1984. On or about August 14, 1990, the IRS mailed a notice of FPAA to the TMP of Cortlandt, asserting increases in the income reported by Cortlandt for tax years 1982 through 1984. The TMPs for Bluegrass and Cortlandt separately filed petitions with the United States Tax Court, contesting the respective proposed partnership adjustments.[1] On May 15, 1996, plaintiffs signed a Form 906, "Closing Agreement on Final Determination Covering Specific Matters," respecting William Grossman's additional tax liability for the Grossmans' share of Cortlandt losses that had been adjusted by the IRS. The closing agreement, after reciting various background facts, allowed Mr. Grossman a loss from Cortlandt of $40,060 for tax year 1982, and required him to report income of $621 from Cortlandt for 1984. The agreement further provided that Mr. Grossman would not be required to report any further income from Cortlandt or, with one limited exception, be liable for any additions to tax or penalties with respect to his investment therein. On July 12, 1996, Maurice Namias, whose title was listed as "Acting" Associate Chief of Appeals of the IRS, signed the agreement on behalf of the Commissioner.[2]

On June 6, 1996, the Tax Court entered a stipulated decision in *Bluegrass*. No appeal was taken from the decision. On October 28, 1996, the same court entered a stipulated decision in *Cortlandt*, with respect to partners who had not previously settled. That decision allowed a partnership loss of $707,000 for 1982 and increased the partnership's income by $110,400 for 1984. No appeal was taken from the decision.

By cover letter dated January 16, 1997, the IRS mailed to plaintiffs a corrected notice of computational adjustment, reflecting adjustments to the Grossmans' distributive share of the losses of Cortlandt and Gatsby in accordance with the Tax Court's decision in *Bluegrass* and the closing agreement. On April 28, 1997, again based upon the *Bluegrass* decision and the closing agreement, the IRS assessed tax and interest against the plaintiffs in the following amounts:

|  | 1982 | 1983 | 1984 |
|---|---|---|---|
| **Tax** | $ 48,548.00 | $15,012.00 | $ 8,177.00 |
| **Interest** | $188,485.89 | $51,578.90 | $23,897.03 |
| **Total** | $237,033.89 | $66,590.90 | $32,074.03 |

The IRS also assessed fees, costs and additional interest in the amount of $50,012.53 for the tax years 1982 through 1984. On October 13, 1999, plaintiffs paid the IRS $250,000, which was applied to plaintiffs' outstanding liabilities for tax years 1982 through 1984. This payment fully satisfied their liabilities for 1983 and 1984; plaintiffs agreed to pay the balance for tax year 1982 in monthly installments of $1,000.[3]

Notwithstanding the *Bluegrass* decision and the closing agreement, on or about May 9, 2000, plaintiffs filed claims for refund of tax, interest and penalties paid for tax years 1982 through 1984, attributable to the assessments described above. On November 15, 2000, the IRS disallowed the claims for refund. On March 12, 2001, plaintiffs filed the instant action, seeking a refund of $49,474 for tax years 1982 through 1984, attributable to the *Cortlandt* portion of the prior assessments. On October 18, 2001, defendant filed a first amended answer, asserting a counter-

1. *Cortlandt Associates, Kevin Smith, Tax Matters Partner v. Commissioner*, Docket No. 24108–90; *Bluegrass Associates '82, Donald J. Kuehne, Tax Matters Partner v. Commissioner*, Docket No. 24107–90.

2. Mr. Namias was a senior appeals officer under the supervision of Angelo J. Chiapperino, the latter being the Associate Chief of Appeals for the Manhattan IRS Appeals Office. While Mr. Chi-

apperino does not recall whether he specifically designated Mr. Namias to act on his behalf on July 12, 1996, he has attested, under oath, that it was his normal practice to do so, in writing, whenever he was out of the office.

3. Portions of the assessments made on April 28, 1997, were either abated or satisfied by the application of overpayment credits for other years.

claim of $96,313.74, representing the balance of the tax, interest, and penalty due for tax year 1982. The parties subsequently filed cross-motions for summary judgment, oral argument on which was held on June 9, 2003.

## II. DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Internal Revenue Code has long provided for the definitive resolution of tax controversies. Thus, for example, section 7121(a) of the Code, which originated as section 102 of the Revenue Act of 1868, 15 Stat. 166, proclaims that the Secretary of the Treasury "is authorized to enter into an agreement in writing with any person relating to the liability of such person ... in respect of any internal revenue tax for any taxable period." 26 U.S.C. § 7121(a). Emphasizing the finality and conclusiveness of such so-called "closing agreements," subparagraph (b) of this section states: "[i]f such agreement is approved by the Secretary,... such agreement shall be final and conclusive," and, with exceptions not herein relevant, "in any suit, action or proceeding, such

agreement, or any determination, assessment, collection, payment, abatement, refund or credit made in accordance therewith, shall not be annulled, modified, set aside or disregarded." 26 U.S.C. § 7121(b); *see also S & O Liquidating Partnership v. Comm'r*, 291 F.3d 454, 459 (7th Cir.2002); *In re Hopkins*, 146 F.3d 729, 732 (9th Cir.1998). Similar provisions, focusing on the settlement of partnership cases, are contained in section 6224(c) of the Code.[4] For agreements under these provisions to be final and conclusive, however, all the procedural requirements of these sections must be met. Illustrating this, a number of cases have held that closing agreements not executed in conformity with those requirements are not binding in and of themselves. *See Botany Worsted Mills v. United States*, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379 (1929).[5]

The Secretary has delegated the authority to administer section 7121, as well as other provisions of the Code, to the Commissioner of Internal Revenue. *See* Treas. Order 150–10 (April 22, 1982); *see also* Treas. Reg. §§ 601.202 (1984) and 301.7121–1 (1967).[6] The Commissioner, in turn, has delegated some of his authority under section 7121 to other IRS officers and employees under Delegation Order No. 209. That order was issued "[p]ursuant to the authority vested in the Commissioner of Internal Revenue

---

4. It is unclear from the terms of the closing agreement at issue whether that agreement was made pursuant to section 6224(c) of the Code; the agreement, however, explicitly references section 7121. For the reasons that follow, the court need not resolve this matter. *Compare Crnkovich v. United States*, 41 Fed.Cl. 168, 173 (1998), *aff'd*, 202 F.3d 1325 (Fed.Cir.2000).

5. Construing a predecessor to section 7121 of the Code, section 3229 of the Revised Statutes, the Supreme Court, in *Botany*, concluded:

   We think that Congress intended by the statute to prescribe the exclusive method by which tax cases could be compromised, requiring therefore the concurrence of the Commissioner and the Secretary, and prescribing the formality with which ... it should be attested.... When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.

   278 U.S. at 288, 49 S.Ct. 129 (citations omitted); *see also Sherwin v. United States*, 320 F.2d 137 (9th Cir.1963), *cert. denied*, 375 U.S. 964, 84

S.Ct. 481, 11 L.Ed.2d 420 (1964); *Auerbach Shoe Co. v. Comm'r*, 21 T.C. 191, 1953 WL 273 (1953), *aff'd*, 216 F.2d 693 (1st Cir.1954); J. Mertens, Mertens Law of Federal Income Taxation § 52.11 (2003) ("Closing agreements are governed by the Code and must meet all the requirements of the statute to be valid and enforceable. If the formal requirements are not met, the closing agreement is invalid.").

6. The Code clearly envisions that some tasks may be delegated by the Secretary of the Treasury, but not others. Thus, section 7701(a)(11)(A) of the Code indicates that when a provision of the Code refers to the "Secretary of the Treasury" it means the "Secretary of the Treasury, personally and shall not include any delegate of his." By comparison, section 7701(a)(11)(B) of the Code prescribes that references to the "Secretary" mean "the Secretary of the Treasury or his delegate." Here, both sections 7121(a) and 6224(c) refer to the "Secretary," making it clear that either the Secretary or his delegate may sign a closing agreement relating to a partnership.

by IRC 6223, 6224, 6228, 6229, 6231(a)(7), 6232, 6243, and 6244," with the listed sections among the provisions for assessing taxes on partnerships.[7] Deleg. Order No. 209 (Rev.5), 1991–1 C.B. 312, 1958 WL 2660. The order provides that "[a]uthority to enter into and approve a written settlement agreement with one or more partners ... with respect to the determination of partnership ... items and any items affected by such items for such partnership ... is delegated to" various IRS officials, including "Chiefs and associate chiefs of appeals offices." *Id.* It also indicates that "[t]he authority delegated herein may not be redelegated." *Id.*

In deciding who had the authority to enter into the closing agreement in question on behalf of the IRS, another delegation order must be considered. As in effect at the time in question, that second order—Delegation Order No. 12—provided, in sweeping terms, that "all Internal Revenue Service supervisory employees are authorized to designate an employee to serve as acting for them during their absence and, if a supervisory position under their supervision and control becomes vacant, to designate an employee to serve as acting until the position is filled." Deleg. Order No. 12 (Rev.13) (eff. June 24, 1994).[8]

In the case *sub judice,* the Associate Chief of Appeals of the Manhattan office of the IRS, pursuant to Order 12, designated another individual in his office to be the acting Chief during a short absence. That acting Chief signed the closing agreement in question on behalf of the IRS. Plaintiffs attack the validity of that agreement on grounds

that it was signed by an unauthorized person and thus did not meet the requirements of section 7121(a) of the Code. They contend that because Order 209 specifically does not permit the redelegation of the authority to sign a partnership closing agreement, it trumps the more general provisions of Order 12 and thus precluded the Associate Chief of Appeals (Mr. Chiapperino) from allowing another individual (Mr. Namias) to sign on his behalf. In so arguing, plaintiffs harken to the familiar canon of statutory construction which provides that the "specific governs the general," *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). It follows, plaintiffs asseverate, that the taxes which are the subject of this suit were improperly assessed and, therefore, are recoverable as a refund. As will be seen, though, there are a number of unstated assumptions entwined within these assertions—assumptions that, once uncoiled and subjected to the hot glare of precedent, quickly wither.

■ Plaintiffs first assume that the "specific governs the general" canon applies here, so that the more specific terms of Order 209—in particular, the provision thereof which prohibits redelegation of authority—prevail over the general provisions of Order 12. But, assuming *arguendo* this canon applies at all in this administrative context,[9] its application here is plainly inapt. To begin with, plaintiffs' statement of this rule is incomplete, as this canon applies only where the conflict between two provisions is ines-

---

7. Congress enacted these sections as part of TEFRA, which act created a single unified procedure for determining the tax treatment of all partnership items at the partnership level, rather than separately at the partner level. *See* H.R. Conf. Rep. No. 97–760, at 599–600 (1982), U.S.Code Cong. & Admin.News 1982, p. 1190; *see also Crowell v. United States,* 305 F.3d 474, 478 (6th Cir.2002); *Crnkovich v. United States,* 202 F.3d 1325, 1328 (Fed.Cir.2000) (per curiam).

8. While the order further states that such designations shall be in writing, it also indicates that the loss of or failure to maintain such records will not invalidate the authority of the individual acting pursuant to the delegation order. *Id.* The courts, indeed, have held that the writing requirement is merely directory and not intended to confer any substantive rights upon taxpayers.

*See Huffmeyer v. Comm'r,* 52 T.C.M. (CCH) 1487, 1494, 1987 WL 40189 (1987); *see also Wessel v. Comm'r,* 65 T.C. 273, 275, 1975 WL 3183 (1975).

9. Courts have generally held that rules of statutory construction may be applied in interpreting regulations. *See Resnik v. Swartz,* 303 F.3d 147, 152 (2d Cir.2002); *Smith v. Brown,* 35 F.3d 1516, 1523 (Fed.Cir.1994); *see also* Lars Noah, "Divining Regulatory Intent: The Place for a 'Legislative History' of Agency Rules," 51 Hastings L.J. 255, 323 (2000). That said, this court can conceive of situations in which caution ought to be applied in transplanting such principles, based upon the inappropriateness of applying a uniquely legislative rationale to an administrative pronouncement. Such circumstances do not appear here, however.

capable, with the decided preference being instead to harmonize the provisions, if possible. *See Nat'l Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335–36, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002); *Edmond v. United States*, 520 U.S. 651, 657, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997); *see also* Norman J. Singer, Sutherland on Statutory Construction § 51.05 (6th ed. 2000) ("Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail,..."). Properly enumerated, then, this canon involves two steps—first, a determination that there is an irreconcilable conflict and then the resolution of such a conflict in favor of the specific over the general. *See Creque v. Luis*, 803 F.2d 92, 95 (3d Cir.1986). By conveniently skipping to the second step before applying the first, plaintiffs essentially transform this canon from a scalpel into a meat axe, giving it considerably more sway than is appropriate.

■ In fact, the predicate for applying this canon is lacking here, as the two provisions in question are easily reconciled. Order 209 gives particular IRS officials, via delegation from the Commissioner, the authority to enter into and approve written settlement agreements in cases such as this. By comparison, Order 12 gives the individuals occupying particular offices the authority to designate an employee to act in their stead during an absence. The second order thus does not serve to redelegate the authority conferred by Order 209 to a new position or to allow two employees to exercise the same authority simultaneously, but merely authorizes a particular individual to "act" in a position that already has been delegated that authority. So construed, there is no positive repugnancy between the two orders; rather, they are complementary—one delegating functions to a particular official and the other designating a temporary replacement when that official is unavailable. *Compare Estate of Brimm v. Comm'r*, 70 T.C. 15, 21, 1978 WL 3330 (1978) (noting, in similar circumstances, that "petitioner's argument,..., fails to recognize a distinction between the delegation of authority and a mere designation").

■ This distinction, indeed, is hardly novel, as evidenced by various cases holding that individuals designated to act on behalf of an absent employee under Order 12 were properly authorized to do so, notwithstanding other provisions prohibiting particular tasks from being redelegated or delegated below particular levels in the IRS organizational structure.[10] That, as plaintiff stresses, none of these cases involve Order 209 is both correct and irrelevant. What is relevant is that these prior cases amply demonstrate that Order 12 may peacefully coexist with other delegations limited in the fashion of Order 209, thereby allowing acting officials to exercise authority that they would not have ordinarily. As such, in these cases—as here—there was no conflict between the general and specific delegations involved and thus no opportunity to apply the rule of construction on which plaintiffs so heavily rely.

---

**10.** *See, e.g., Barry v. United States*, 534 F.Supp. 304, 307 (E.D.Pa.1982) (official designated to act in place of IRS District Director could issue notice of termination assessment, notwithstanding requirement in revenue procedure that such notice be "personally approved by the District Director"); *Commonwealth Development Ass'n v. United States*, 365 F.Supp. 792, 797–98 (M.D.Pa. 1973), *aff'd*, 503 F.2d 1398 (3d Cir.1974) (table) (chief of collections division acting, under Order 12, as district director, authorized to approve jeopardy assessment, despite provision in revenue procedure requiring district director to "personally approve" such assessments); *Sanderling, Inc. v. Comm'r*, 66 T.C. 743, 753–54, 1976 WL 3702 (1976), *aff'd in relevant part*, 571 F.2d 174, 177 (3d Cir.1978) (revenue agents acting, under Order 12, as group supervisors, held authorized to sign extension of statute of limitations, despite provision in Delegation Order 42 (Rev.5), prohibiting delegation of such signing authority below supervisor level); *Huffmeyer*, 52 T.C.M. (CCH) at 1494 (same holding as to revenue agent signing extension of statute of limitations, despite non-delegation provision in Delegation Order 42 (Rev.6), 1975–1 C.B. 635); *see also Mecom v. Comm'r*, 101 T.C. 374, 390, 1993 WL 444600 (1993), *aff'd*, 40 F.3d 385 (5th Cir.1994) (table) (rejecting similar argument as to extension of statute of limitations, stating that "a person acting in a temporary position assumes and possesses all the authority vested in, or delegated to, that position").

In presenting their case, plaintiffs also presuppose that no other rules of construction counter their interpretation.[11] But, that is not so. For one thing, the Supreme Court has made clear that "[n]o rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences." *United States v. Brown*, 333 U.S. 18, 27, 68 S.Ct. 376, 92 L.Ed. 442 (1948); *see also United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486–87, 19 L.Ed. 278 (1868); *Comm. to Preserve American Color Television v. United States*, 706 F.2d 1574, 1578 (Fed.Cir.1983), *cert. denied*, 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983). Yet a ruling in plaintiff's favor would necessarily leave acting IRS officials unable to perform wonted tasks not only under Order 209, but also under dozens of other delegation orders and revenue procedures that contain similar prohibitions on redelegation.[12] Suffice it to say that this court will not lightly imply an intent by the IRS to disrupt its own operations, causing certain IRS offices, including that of the Commissioner, to grind to a halt during transition periods or if a key individual is absent.

In addition, cases dealing with the *generalia specialibus* canon make clear that axiom must yield if there is indication that the general rule was intended to be controlling.[13] And there is such indication here. Through its various iterations, Order 12 has become more sweeping and less restrictive.[14] In particular, the long history of the order suggests that its *raison d'etre* is to avoid requiring the IRS to provide for the task-by-task itemized assumption of duties by particular individuals in the case of a superior being absent or an office being vacant. In light of this, the court is averse to embrace the confining construction plaintiffs would place on that order, which instead would require dozens of specific delegation orders to each separately deal with such absences or vacancies. In choosing instead to effectuate the agency's design, the court is persuaded that the IRS is the best expositor of its own orders. Indeed, far beyond the deference afforded agency interpretations of statutes, an agency's view of its own regulations is controlling "unless it is plainly erroneous or inconsistent with the regulation." *Udall v. Tallman*, 380 U.S. 1, 17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *see*

11. "Canons of construction need not be conclusive," the Supreme Court recently stated, "and are often countered ... by some maxim pointing in a different direction." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001); *see also Nat'l Data Corp. & Subs. v. United States*, 50 Fed.Cl. 24 (2001), *aff'd*, 291 F.3d 1381 (Fed.Cir.), *cert. denied, sub nom., NDCHealth Corp. & Subs. v. United States*, 537 U.S. 1045, 123 S.Ct. 619, 154 L.Ed.2d 517 (2002).

12. *See, e.g.*, Deleg. Order No. 4 (Rev.23), reprinted in I.R.M. § 1.2.2.2 (authority to issue summonses); Deleg. Order No. 11 (Rev.29), reprinted in I.R.M. § 1.2.2.5 (authority to accept offers in compromise); Deleg. Order No. 23 (Rev.15), reprinted in I.R.M. § 1.2.2.14 (authority to settle and pay employee's personal property claims); Deleg. Order No. 96 (Rev.13), reprinted in I.R.M. § 1.2.2.46 (authority to prescribe the extent to which a letter ruling will be applied without retroactive effect); Deleg. Order No. 111 (Rev.13), reprinted in I.R.M. § 1.2.2.56 (authority to compromise administratively claims collection actions); Deleg. Order No. 113 (Rev.14), reprinted in I.R.M. § 1.2.2.58 (authority to issue exempt organization determination letters); Deleg. Order No. 114 (Rev.13), reprinted in I.R.M. § 1.2.2.59 (authority to act as competent authority under tax treaties); Deleg. Order No. 156 (Rev.17), reprinted in I.R.M. § 1.2.2.76 (authority to permit disclosure of tax information); De-

leg. Order No. 231 (Rev.4), reprinted in I.R.M. § 1.2.2.132 (authority to abate interest on erroneous refunds); Deleg. Order No. 247 (Rev.1), reprinted in I.R.M. § 1.2.2.147 (authority to settle and compromise industry-wide and international issues).

13. *See, e.g., In re Guardianship of Penn*, 15 F.3d 292, 294 (3d Cir.1994); *see also* Sutherland, § 51.05 at 256–57 (citing additional cases).

14. As illustrated in an appendix filed by plaintiffs, through July 6, 1994, there were 13 different versions of Order 12 (a fourteenth version has more recently been issued). While initially these orders were relatively brief, over time they become very detailed, containing specific instructions for designating acting officials in each of the IRS major offices. *See, e.g.*, Deleg. Order No. 12 (Rev.5). In April of 1991, the IRS issued version 12 of the order, streamlining it somewhat by replacing references to specific positions/officials with more general provisions. *See* Deleg. Order No. 12 (Rev.12). Version 13 of the order—the one applicable here—was dramatically condensed, even as compared to its shorter predecessor, shrinking from 21 to 6 paragraphs. By way of explanation, the official transmittal memorandum indicated that this simplification was "in keeping with the Service's philosophy of burden reduction and simplification." I.R.S. Off. Mem. (June 1, 1994).

*also Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Eli Lilly & Co. v. Bd. of Regents of Univ. of Wash.,* 334 F.3d 1264, 2003 WL 21512572 at *6 (Fed.Cir. July 03, 2003) (citing numerous cases). Logic suggests that this rule should apply with even greater force, where, as here, the agency is neither exercising legislative rulemaking authority nor interpreting a statute, but rather issuing rules governing its own internal operations. As such, it is largely determinative that the agency's interpretation of its own orders here is neither plainly erroneous nor inconsistent with the terms of the orders.

■ Plaintiffs make one last faulty assumption—that if Mr. Grossman's agreement is, in fact, invalid, they may recover the taxes at issue. That *ipse dixit,* however, does not follow because, in the court's view, plaintiffs are equitably estopped from challenging the validity of the assessment predicated upon that agreement. In this regard, this case bears strong similarity to *Union Pacific R.R. Co. v. United States,* 847 F.2d 1567 (Fed.Cir. 1988), where the taxpayer railroad challenged an agreement concerning the payment of certain interest long after the government could recoup the benefits it received under the same agreement. Based on *Botany Mills, supra,* the government conceded that the agreement was invalid. Yet, the Federal Circuit held that the doctrine of equitable estoppel would bar the railroad from reneging on the agreement if three requirements were met: (i) the execution of the agreement was the result of a mutual concession or compromise; (ii) there was a meeting of the minds that the claims be extinguished; and (iii) that to allow the plaintiff to reopen the case would be prejudicial given the government's reliance on the agreement. *Union Pacific,* 847 F.2d at 1571 (citing *Kretchmar v. United States,* 9 Cl.Ct. 191, 198 (1985)). Finding these requirements were met, the Federal Circuit concluded that it "would be inequitable to now require the government to pay Union Pacific interest Union Pacific had forfeited through

a bargained for compromise informal agreement." *Id.* at 1572–73.[15]

Applying *Union Pacific* to the facts at hand, it is apparent that all three requirements for the application of the estoppel doctrine are met: (i) the execution of the closing agreement was the result of a mutual concession in which the IRS agreed, *inter alia,* to forego the assertion of penalties against the plaintiffs; (ii) there most certainly was a meeting of the minds that any claims by taxpayer to more favorable tax treatment than that offered in the agreement were extinguished; and (iii) allowing the plaintiffs to reopen this case certainly would prejudice the IRS, as plaintiffs not only seek to recover taxes that cannot now be assessed, but also would escape the assertion of any penalties or other additions to tax that might have previously been assessed due to the tolling of statute of limitations. In such circumstances, this court believes that plaintiffs should be estopped from challenging the validity of Mr. Grossman's closing agreement and, in turn, the assessments made based upon that agreement. Numerous courts, indeed, have, on similar facts, enforced agreements against taxpayers seeking to recover taxes that they admitted were owed after the IRS could not recoup its end of the bargain. *See, e.g., Aronsohn v. Comm'r,* 988 F.2d 454, 456–57 (3d Cir.1993); *Elbo Coals, Inc. v. United States,* 763 F.2d 818, 819–20 (6th Cir.1985); *Guggenheim v. United States,* 111 Ct.Cl. 165, 77 F.Supp. 186, 196 (1948), *cert. denied,* 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441 (1949); *Kretchmar,* 9 Cl.Ct. at 198.

Finally, though not determinative in its own right, this court believes that important policy considerations dictate that taxpayers, no less than the IRS, should be compelled to honor their agreements. In this regard, the comments of the Second Circuit in *Stair v. United States,* 516 F.2d 560, 565 (2d Cir. 1975), are particularly apposite:

We feel constrained to note that prudential considerations dictate the same result as we reach today. It requires little elabo-

---

15. *See also, e.g., McMullan v. United States,* 231 Ct.Cl. 378, 686 F.2d 915, 924 (1982); *McGraw–Hill, Inc. v. United States,* 224 Ct.Cl. 354, 623 F.2d 700, 706 (1980); *D.D.I., Inc. v. United* *States,* 199 Ct.Cl. 380, 467 F.2d 497 (1972), *cert. denied,* 414 U.S. 830, 94 S.Ct. 61, 38 L.Ed.2d 65 (1973).

ration to demonstrate that a contrary outcome would arm the taxpayer with both a shield and a sword, and permit him to enter the lists with no chance of losing. The [taxpayer], if allowed to proceed, could fare no worse than the compromise they have already succeeded in negotiating. If victorious on the merits, they would be freed even from the obligation of sustaining their half of that bargain. Given such a state of affairs, it would be an imprudent taxpayer indeed who did not resort to litigation even after compromise. We see little purpose in straining *Botany Mills* to the breaking point in order to accommodate such a result.

*See also Guggenheim,* 77 F.Supp. at 196 ("It would obviously be inequitable to allow the plaintiff to renounce the agreement when the Commissioner cannot be placed in the same position he was when the agreement was executed."); *Toker v. United States,* 982 F.Supp. 197, 203 (S.D.N.Y.), *aff'd,* 133 F.3d 908 (2d Cir.1997) (table).[16]

## III. CONCLUSION

The court is persuaded that the designation provisions of Order 12 complement the delegation provisions of Order 209, thereby allowing appropriate IRS supervisors to designate temporarily an individual to sign closing agreements on their behalf. As such, in the last analysis, Mr. Namias, as "Acting" Associate Chief of Appeals, had the requisite authority to enter into the closing agreement at issue between the plaintiffs and the IRS. Therefore, that agreement is valid and binding in determining plaintiffs' tax liabilities. Accordingly, plaintiffs' motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**. The Clerk, therefore, is ordered to dismiss plaintiffs' complaint.

In its cross-motion, defendant, relying on its counterclaim, seeks to reduce to judgment the tax amount outstanding as to plaintiffs' tax year 1982. Since the court has concluded that those taxes, and any additions thereon, are due and owing, the Clerk will enter judgment on behalf of the United States in the amount of $96,313.74, representing the balance of the tax, interest, and penalty due for tax year 1982.

**IT IS SO ORDERED.**

---

16. More colloquially, the court is reminded of hapless Alice who, upon tumbling into the rabbit hole and finding the door to the garden locked, decided to solve her plight by eating a piece of cake. " 'Well, I'll eat it,' said Alice, 'and if it makes me grow larger, I can reach the key; and if it makes me grow smaller, I can creep under the door; so either way I'll get into the garden, and I don't care which happens!' " Lewis Carroll, Alice's Adventures In Wonderland, 8 (Holt, Rinehart & Winston 1985)(1865). After savoring every morsel, Alice "was quite surprised to find that she remained the same size; to be sure, this is what generally happens when one eats cake, but Alice had got so much into the way of expecting nothing but out-of-the-way things to happen, that it seemed quite dull and stupid for life to go on in the common way." *Id.* at 8. Like Alice, after all is said and done here, plaintiffs can neither rise above nor shrink from their obligations.