**H. W. NELSON COMPANY, Inc.,**

v.

**The UNITED STATES.**

**Cong. No. 13–58.**

United States Court of Claims.
Oct. 3, 1962.

Thomas G. Carney, Washington, D. C., for plaintiff.

Theodore D. Peyser, Jr., Washington, D. C. with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

WHITAKER, Judge.[1]

This case is before us pursuant to the provisions of House Resolution 636 of the House of Representatives of the 85th Congress of the United States, Second Session, referring a bill (H.R. 6234, entitled "A Bill for the Relief of the H. W. Nelson Company, Incorporated,") to this court for proceedings in accordance with the provisions of sections 1492 and 2509 of Title 28 of the United States Code. The court is requested to inform the Congress of the "nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant."

Plaintiff's claim involves amounts of income taxes, interest thereon and penalties assessed and collected by the defendant with respect to the Federal income-tax liability of the plaintiff for the fiscal year ending August 31, 1941. Plaintiff's return was filed by plaintiff June 15, 1943, reporting a tax liability of $31,-467.38. The only item of income reported on the return was the sum of $378,-143.18 which was identified as being a portion of the sum of $550,000 received by plaintiff on June 7, 1941, in settlement of a judgment against Grand Trunk Western Railroad, successor by consolidation of Detroit, Grand Haven and Milwaukee Railway Company. The statement attached to the return stated that the balance of the settlement award, $171,586.82, was included by the Commissioner of Internal Revenue in the taxable net income of the plaintiff for

the fiscal year ending August 31, 1929. No part of the amount of tax liability, as indicated on the return, was paid at the time of the filing. The Commissioner determined that a delinquency penalty of 25 percent of the tax liability of $31,-467.38 reported ($7,866.85) should be asserted against the plaintiff, and accordingly such penalty, in addition to the tax with interest, was assessed against plaintiff.

The settlement sum of $550,000 was received by plaintiff under the following circumstances:

Plaintiff, a Kentucky corporation, was engaged in the business of constructing railroads. Its income from construction contracts was recorded on its books and reported on its tax returns on the completed contract method and on the basis of cash receipts and disbursements. As of December 31, 1928, plaintiff had seven uncompleted contracts, including a contract with Detroit, Grand Haven and Milwaukee Railway Company (hereafter referred to as the Birmingham contract).

Under the Birmingham contract, plaintiff was to construct approximately 11 miles of two-track railroad on a right-of-way, to be provided by the Railroad. The right-of-way was to be free of liens, claims and adverse interests. The contract further provided that plaintiff could assign said contract only with the written consent of the Chief Engineer of the Railroad, which consent would in no way release or relieve the plaintiff from any of its obligations and liabilities under the contract.

About June 1, 1928, having been notified by the Railroad that substantially all of the right-of-way had been procured, plaintiff began its work. However, the right-of-way that had been procured was burdened with restrictive covenants. Threatened with injunction proceedings from the landowners, the Railroad in-

[1]. Since the findings of the Trial Commissioner, based upon the stipulations of the parties, were reported and the case was tentatively decided prior to the decision of the Supreme Court in Glidden

Co. v. Zdanok, rendered on June 25, 1962, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671, we think it proper to file this report without reference to the effect of the Supreme Court's opinions in that case.

structed plaintiff to move its equipment to a different location. Plaintiff did so, but several injunction proceedings followed, with the result that plaintiff's work had to be stopped on August 3, 1928, and could not be resumed until July 12, 1929.

During 1928 plaintiff had serious financial difficulties. Seeking additional capital to alleviate these difficulties, Henry W. Nelson, plaintiff's president and majority shareholder, approached Chase & Gilbert, Inc. of Boston, Massachusetts. Since Chase & Gilbert was unwilling to enter into a financial arrangement directly with plaintiff, it was finally decided that a new corporation would be formed to acquire all of plaintiff's assets, except certain real estate and two automobiles. The new corporation was to assume all of plaintiff's liabilities, Chase & Gilbert was to arrange a bank loan of $60,000 for the new corporation, and was to purchase $300,000 of its notes at 93. Nelson was to be elected president. Pursuant to the resolution of its Board of Directors, all of plaintiff's assets, except for the real estate and automobiles, were transferred to the new corporation, known as Nelson and Chase & Gilbert Company (hereafter referred to as the "Boston Company"), in consideration of the assumption by the Boston Company of all plaintiff's liabilities.

This transaction was completed on January 21, 1929. The record discloses that several days prior to the formal corporate actions, Nelson telegraphed Dey, a vice-president of Chase & Gilbert, expressing his unwillingness to seek the Railroad's consent to the assignment of the Birmingham contract. In response thereto, Dey suggested that they simply keep the present companies alive and have them give their securities and property to the new company. Notwithstanding this recognition of the terms of the contract limiting its transferability, the formal corporate authorizations were phrased in unqualified terms, making no reference to any restrictions on assignability of the Birmingham contract, ex-

pressing no intent to withhold any rights in this contract from among the rights and properties to be transferred. After December 31, 1928, the Boston Company physically performed the Birmingham contract, disbursed all amounts expended in connection with such performance, kept all records as to expenses incurred and payments received, except the $550,000 settlement from the Railroad in 1941.

As of December 31, 1928, plaintiff's books show, for the Birmingham contract, an asset account of $200,042.87, representing the amount then due plaintiff from the Railroad, and a deferred earnings account of $70,687.92 as plaintiff's computed profit. These accounts, as well as all other asset and liability accounts being transferred, were closed out to "Nelson Liquidating Account." Nelson then transferred all assets to the Boston Company, which opened asset and liability accounts in its books with the same balances as plaintiff's closing entries.

Work on the Birmingham contract was resumed on July 12, 1929, and completed in 1931. The machinery and equipment used in this work were carried as assets on the books of the Boston Company, expenses were paid by checks drawn on bank accounts in the name of the Boston Company or by cash withdrawn from these accounts. The books carried "Accounts Receivable" and "Accrued Expenses—Birmingham Job" for the Birmingham contract. The Boston Company also completed the six other contracts, recorded on its books in like manner, and reported the profit or loss on them in its tax returns on the completed contract method. Expenses and receipts appear on plaintiff's books prior to December 31, 1928, and on the Boston Company's books after that date, although the entries cannot be verified. Neither the books of plaintiff nor those of the Boston Company contain evidence of any indebtedness existing at any time between plaintiff and the Boston Company.

Based upon the foregoing transactions and events, the tax returns of the Nelson Company and the Boston Company were as follows:

TAX RETURNS—1929 TO 1935

| Date | Nelson Company | Boston Company |
|---|---|---|
| 1929 | Reported $394.93 income as "Interest and discount earned", and no tax due. (Filed November 12, 1929) | Reported $510.77 income, no tax due. Statement listed nine uncompleted contracts, including the Birmingham contract. |
| 1930 | Reported no income, no tax due, and contained a notation of "Inactive year." (Filed November 14, 1930) | Reported nine jobs, four of which were completed at a loss. The Birmingham contract was listed as uncompleted. |
| 1931 | Filed a blank return except for a notation that the company was inactive for 1931. (November 10, 1931, a deficiency was assessed for 1929.[2]) (Filed January 15, 1932) | Reported income from equipment rental. Statement listed six jobs all uncompleted, including the Birmingham contract. |
| 1932 | No return was filed from 1932 through 1940. | Reported three contracts completed at a small profit, and tax due of $52.79 which was paid with the return. Three contracts, including Birmingham, were listed as uncompleted.[3] |
| 1933–1935 | | Returns were filed, but none showed the Birmingham contract as completed. (The Company lost its charter in 1935 and filed no returns thereafter.) |

---

2. On December 31, 1928, the books of the Nelson Company had an account "Unfinished Jobs" showing a balance of $262,573.99, which amount included $70,687.92 from the deferred earnings account on the Birmingham contract. In 1931 a deficiency of $33,357.89 ($29,803.15 plus $3,554.74 interest) was assessed against the Company by a jeopardy assessment, based upon inclusion in income for 1929 of the $262,573.99 credit balance. The Company exercised its right to petition the Board of Tax Appeals, but the petition was dismissed for lack of prosecution. In the order dismissing said petition, the court stated that there was a deficiency for 1929 in the amount of $29,803.15.

3. On November 30, 1932, acting upon authority conferred upon him by the Board of Directors of both the Nelson Company and the Boston Company, Nelson accepted payment from the Railroad of $25,433.35, in full payment for any claim arising out of the Birmingham contract except as to those related to delay in obtaining the right-of-way. This amount was deposited in the bank accounts of the Boston Company and entered on its books as income.

We think that the foregoing facts show a transfer from plaintiff to the Boston Company of all of its rights under the Birmingham contract, which was effectual as between plaintiff and the Boston Company, but ineffectual as to the Railroad. As between plaintiff and the Boston Company, there was a complete transfer by plaintiff to the Boston Company of all of its rights and of all of its responsibilities and liabilities under the contract.

The Court of Appeals for the Sixth Circuit, in the case of Grand Trunk Western Railroad v. H. W. Nelson Company, 116 F.2d 823, stated that the contract "was nonassignable without appellant's [the Railroad's] consent which is neither alleged nor proved." However, this was a suit by plaintiff against the Railroad, and what the Sixth Circuit Court of Appeals had reference to was the assignability of the contract, so far as the Railroad was concerned. There was no reason for it to consider the effect of the transfers as between plaintiff and the Boston Company. We have no doubt that as between the two, the transfers were effectual to divest plaintiff of all of its rights under the contract, to vest in the Boston Company these rights, and to charge the Boston Company with all responsibility, insofar as plaintiff was concerned, with carrying out the contract.

Although the assignment was effectual as between plaintiff and the Boston Company, only plaintiff could maintain an action against the Railroad, because the Railroad did not recognize the transfer of the contract by plaintiff to the Boston Company. So far as it was concerned, there had been no transfer which was effectual as to it.

But it would seem that any recovery by plaintiff would be for the account of the Boston Company. How plaintiff became entitled to retain the money which it recovered from the Railroad, as hereinafter set out, is unexplained in the record. But the Boston Company, having been dissolved some six years before the recovery from the Railroad, never claimed the money which plaintiff had recovered, nor did the shareholders of the Boston Company, although Nelson owned one-half the stock of that company and Chase and Gilbert owned the other half. In some unexplained way plaintiff was entitled to keep the money it recovered, and it did keep it, and the amount received, therefore, was income to it in the year it was received.

But plaintiff says that none of the $550,000 received from the Railroad in 1941 was taxable income, because it was "a return of capital." Plaintiff argues that whether the proceeds of litigation received by a successful litigant constitute taxable income depends upon the nature of the claim on which the recovery was realized. It says that where such recovery represents a reimbursement of money previously expended by the claimant, the money recovered constitutes a return of capital and is not taxable income, qualified only when and to the extent that the party recovering such costs has previously employed such costs as deductions to offset other income for Federal tax purposes. But, even if we admit, arguendo, the correctness of the proposition stated by plaintiff, it must still show that it had incurred these expenses and had not deducted them in prior income tax returns. It, itself, must have incurred these expenses. There are no provisions in the tax laws whereby one taxpayer can deduct from his gross income expenses incurred and defrayed by another.

Since plaintiff had assigned all of its rights in the Birmingham contract to the Boston Company, and the Boston Company had assumed plaintiff's liabilities thereunder, and had used on the job the equipment carried on its books as its assets, and had received from the Railroad money due for work done, and had disbursed from its own account money to pay the expenses of doing the work, and since plaintiff's income tax returns for the years subsequent to 1929 show that it was in "inactive status", and since no return at all was filed by plaintiff from and including 1932 to and in-

cluding 1940—taking all these things into consideration, we must conclude that all expenditures subsequent to 1929 were not plaintiff's expenditures, but were the expenditures of the Boston Company, which was an entirely different entity from plaintiff. The money recovered from the Railroad, therefore, could not be considered a recoupment by plaintiff of its expenses incurred on account of the delay, except such expenses as it may have incurred on account thereof prior to the date of the assignment of the Birmingham contract, which was on January 21, 1929, to take effect as of December 31, 1928.

■ But we do not think it necessary for us to determine how much of the $550,000 was to reimburse plaintiff for expenses it had incurred on account of delay in obtaining the right-of-way prior to December 31, 1928. In a breach of contract action, a determination that a litigant be awarded a money judgment as reimbursement for materials, labor, supplies, and the like, called "capital expenditures" by the Sixth Circuit, would not support a contention by the recipient in a tax proceeding that such money received was a "capital expenditure" in the tax sense. In the tax law, "capital expenditures" and "business expenses" are terms of art, representing different categories with specific provision for the treatment of each.

In the case of Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, the Supreme Court dealt with a recovery by a taxpayer for misrepresentation in connection with the purchase of shares of stock, which he had purchased as an investment. It said that the Tax Court was justified in having treated this recovery as a return of capital, to offset losses sustained in a prior year when the stock was sold. However, in that case the Supreme Court recognized the distinction between a return of capital and the recoupment of expenses incurred in the performance of a contract. It approved the statement in Burnet v. Sanford & Brooks Company, 282 U.S. 359, 363 to 364, 51 S.Ct. 150, 151, 75 L.Ed.

383, reading, "While it [the money] equalled, and in a loose sense, was a return of, expenditures made in performing the contract, still, as the Board of Tax Appeals found, the expenditures were made in defraying the expenses * * *. They were not capital investments, the cost of which, if converted, must first be restored from the proceeds before there is a capital gain taxable as income." In the case of Burnet v. Sanford & Brooks Company, supra, the Supreme Court had said that since returns were made on an annual basis, a recovery by a taxpayer in a subsequent year for misrepresentations with reference to the work to be done under the contract was income in the year in which received, notwithstanding the fact that the recovery was by way of reimbursement of the taxpayer for expenses incurred in previous years by reason of the misrepresentation.

■ The only difference between this case and Sanford & Brooks is that here the taxpayer made its return on a completed contract basis, whereas in Sanford & Brooks returns were made on an annual basis. But this difference is immaterial. The contract in the case at bar was completed in 1931. In that year all receipts under the contract should have been taken into account and all expenses incurred up to that date should have been deducted therefrom, both amounts received and expended by plaintiff and the Boston Company, and a return for 1931 should have been filed on that basis. No account could have been taken in that return for a problematical recovery some time in the future of damages on account of delay in obtaining the right-of-way.

So it is, that, when plaintiff received the $550,000 in the year 1941 on account of damages for delay in securing the right-of-way, this amount of money was income to plaintiff in the year it was received, to wit, 1941. And, under the authority of Burnet v. Sanford & Brooks supra, in determining plaintiff's tax liability for 1941, the amount received in that year cannot be reduced by any ex-

penses incurred in prior years on account of the damages for delay. The entire amount of $550,000 was income to plaintiff in the year 1941, and taxes should have been assessed accordingly.

The case at bar cannot be distinguished from the case of Burnet v. Sanford & Brooks Company, supra. During the years 1913 to 1915 the respondent was engaged in carrying out a contract for dredging the Delaware River. In making its income tax returns for the years 1913 to 1916, respondent deducted from gross income from each year its expenses paid in that year in performing the contract. The expenses exceeded the payments received under the contract. The tax returns for 1913, 1915 and 1916 showed net losses, but that for 1914 showed net income. In 1915 work under the contract was abandoned, and in the following year suit was brought in this court to recover for a breach of warranty of the character of the material to be dredged. This court rendered a judgment for the plaintiff, which was affirmed by the Supreme Court in 1920, and plaintiff received in that year the sum of $192,577.59, which included the $176,271.88, by which its expenses under the contract had exceeded receipts from it; in addition, the gross sum also included accrued interest, amounting to $16,305.71. Notwithstanding the fact that the major portion of the recovery was to reimburse plaintiff for the amounts by which its expenses had exceeded its receipts, ·nevertheless, the Supreme Court held that the entire amount received in the year 1920 was taxable as income in that year, without any deduction.

So, in the case at bar, the amounts recovered in the year 1941 for damages for delay in securing the right-of-way was income to the plaintiff in the year received, notwithstanding the fact that the recovery was intended to reimburse plaintiff for its expenses in excess of the amounts received under the contract.

There is no justification for the assessment against plaintiff of a deficiency for 1929. As stated heretofore, plaintiff made its returns on a completed contract basis. The contract was not completed when it was assigned to the Boston Company and, therefore, no income from the contract was due to be reported. No income or loss should have been reported with reference to this contract until its completion and that was in the year 1931. The deficiency assessed against plaintiff for 1929 was erroneous. However, this deficiency was refunded to plaintiff, partly in cash and partly by credits against its 1941 tax liability.

Hence, we are concerned only with the correctness of the Commissioner's action in reference to plaintiff's tax liability for 1941. Plaintiff made a return for that year showing net income of $378,143.18. This figure was arrived at by deducting from the $550,000 received from the Railroad in that year, the sum of $171,856.82 on account of expenses incurred prior to the transfer of the contract to the Boston Company. As we have stated, this deduction was erroneous. Plaintiff should have returned the full $550,000.

■ The Commissioner of Internal Revenue, however, did not assess plaintiff a tax upon the basis of the full $550,000, but he did add to the $378,143.18, reported by plaintiff, the sum of $70,687.92, making a total of $448,831.10. This $70,687.92 was the amount of estimated profit derived on the Birmingham contract, as shown on plaintiff's books at the time of the transfer of the contract to the Boston Company. There was no justification for this; but, even so, the total of $448,831.10 upon which the Commissioner did assess a tax against plaintiff was something over $100,000 less than the amount of income on which the tax should have been assessed. Plaintiff, therefore, cannot complain of this unwarranted addition to the amount of its income as reported on its return for the year 1941.

■ But irrespective of the correctness of what we have heretofore said, nevertheless, we think plaintiff is estopped, illegally and equitably, from now asserting any claim against defendant on account of of any taxes, penalty or

interest it may have paid to defendant by virtue of income alleged to have been received on account of the Birmingham contract. It is estopped by virtue of two offers in compromise which were accepted by defendant.

The first offer was dated October 27, 1946. At this time there was outstanding plantiff's claim for refund of the assessment against plaintiff for 1929 of $33,357.89, $29,803.15, tax, plus interest, and .$22,998.21, interest accrued after the assessment, which plaintiff had paid. There was also outstanding an assessment against plaintiff for 1941 of the $31,467.38 shown on plaintiff's return for 1941, plus $7,866.85 penalty, and interest of $2,989.40, a total of $42,-323.63, and also a deficiency assessment for 1941 of $29,172.25, including interest and penalty. Thus plaintiff, on the one hand, was claiming a refund of 1929 taxes of $56,357.10, and the Commissioner of Internal Revenue was claiming assessments for 1941 or $71,495.88. Plaintiff offered to settle these respective claims as follows: It agreed to consent to (a) the assessment and collection of a deficiency for 1941 of $21,-206.37, and (b) accept as correct an overassessment for 1929 of $29,803.15 plus interest. Plaintiff agreed that if the offer was accepted, the case would not be reopened in the absence of fraud, malfeasance, concealment or misrepresentation of material fact, or of an important mistake in mathematical calculations, that plaintiff would not file an offer in compromise respecting such liabilities, and would not file or prosecute any claims for refund of income tax or penalty for the taxable year ending August 31, 1941. We think it well to quote the exact language of the offer with respect to reopening the case. It reads:

"If this proposal is accepted by or on behalf of the Commissioner, the case shall not be reopened in the absence of fraud, malfeasance, concealment or misrepresentation of material fact, or of an important mistake in mathematical calculations, and the taxpayer agrees: (1) to make payment of the above deficiencies for the taxable year ended August 31, 1941, together with interest, as provided by law, promptly upon receipt of notice and demand from the Collector of Internal Revenue, and not to file an offer in compromise respecting such liabilities; (2) not to file or prosecute any claims for refund of income tax or penalty for the taxable year ended August 31, 1941 and upon request of the Commissioner to execute at any time a final closing agreement as to the tax liabilities on the foregoing basis for the said years under the provisions of Section 3760 of the Internal Revenue Code. * * *"

This offer was accepted by the Internal Revenue Service on June 4, 1948, and in accordance therewith, a timely assessment was made against plaintiff for 1941 in the amount of $27,943.84, of which $16,965.10 was tax, $6,737.47 interest, and $4,241.27 penalty. This assessment of $27,943.84 plus the original assessment of $42,323.63 brought the total assessment for 1941 to $70,-267.47.

The overassessment agreed to for 1929 was eliminated by a cash payment to plaintiff of $19,739.56 (of which $14,-325.51 was interest), and credits against the 1941 assessment of $51,524.56. This reduced the balance due on the assessment to $18,742.91 plus delinquency interest. This balance was further reduced by payment by plaintiff of amounts totalling $1,974.96, the last payment being made June 16, 1953.

Despite its agreement in the 1948 offer of compromise, plaintiff, on September 22, 1953, filed a claim for refund and a substitute offer in compromise. The justification for attempting to reopen the case was, *inter alia*, "because of a mutual mistake of law and fact, a completely erroneous basis had been used in determining its 1941 tax liability." The claim demanded a refund of $56,000.12, more or less, for 1941. The accompanying offer sought to compromise plaintiff's liability for 1941 for $10 which was paid

with the offer. In a statement attached to the claim for refund and offer in compromise, plaintiff alleged that the Birmingham contract was never assigned to the Boston Company, that it had made payments to the Boston Company for loans from it enabling plaintiff to perform said contract, and that the end result of the contract was a loss to plaintiff. It also contested the inclusion in income for 1941 of the amount of $70,687.92—the basis for the deficiency plaintiff had proposed to accept in its previous offer in compromise—because it had already been included in plaintiff's taxable income for 1929.

Plaintiff was notified in July, 1954, that the claim would be disallowed, stating the reasons to be: (1) the claim was timely only as to payments made during the immediately preceding two years; (2) the Birmingham contract was completed and accepted prior to the 1941 taxable year; (3) only part of the costs claimed by plaintiff in performance of the Birmingham contract was borne by plaintiff, which costs were recovered tax free in another year; and (4) plaintiff had waived its right to file a claim for refund for 1941.

On February 1, 1955, plaintiff filed an "Amended Offer in Compromise" seeking to compromise for $2,339.68 its liability for 1941 which by then amounted to $16,757.25 plus delinquency interest. This was accepted on December 7, 1955, because of doubt as to the collectibility of the balance due. The offer provided in part that as partial consideration, the plaintiff expressly agreed that all prior payments and credits made for the period under consideration were to be retained by the United States, and plaintiff expressly waived all claims to money to which it might be entitled under internal revenue laws, due to overpayments made prior to the acceptance of the offer, of any tax or other liability, including interest and/or ad valorem penalty and interest on overpayments or otherwise as are not in excess of the difference between the liability sought to be compromised and the amount offered,

and agreed that the United States might retain such amounts, if any. In accordance with this agreement, plaintiff paid to the Government the sum of $2,339.68, the last payment having been made on December 15, 1955. The balance of the 1941 assessment ($14,427.67) was abated.

This last offer stated, *in haec verba:*

"In making this offer, and as a part consideration thereof, the proponent hereby expressly agrees that all payments and other credits heretofore made to the account(s) for the period(s) under consideration shall be retained by the United States, and, in addition, the proponent hereby expressly waives:

"1. Any and all claims to amounts of money to which the proponent may be entitled under the internal revenue laws, due through overpayments made prior to the date of the acceptance of this offer of any tax or other liability, including interest and/or ad valorem penalty, and interest on overpayments or otherwise, as are not in excess of the difference between the liability sought to be compromised hereby and the amount herein offered, and agrees that the United States may retain such amounts of money, if any."

In complete disregard of the agreements made in its two offers in compromise, plaintiff now seeks to recover by private bill introduced in the House of Representatives in March 1957, the sums which, for a valuable consideration, it solemnly agreed the Government might retain.

This is done in face of the fact that after the payment by plaintiff to defendant of the sum of $2,339.68, the balance of the 1941 assessment against plaintiff of $14,427.67 was abated. It is also in face of the fact that the statute has now run against the assertion by the Government of any additional deficiency for the year 1941, and it had run when plaintiff secured the introduction in the

House of Representatives of the private relief bill.

In Guggenheim v. United States, 77 F.Supp. 186, 111 Ct.Cl. 165, certiorari denied, 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441, rehearing denied, 336 U.S. 911, 69 S.Ct. 513, 93 L.Ed. 1075, we held that a taxpayer who executed an agreement such as that involved in the instant case was equitably estopped from prosecuting a claim for refund filed after the agreement was executed. The only difference between this case and the Guggenheim case is that in the latter there had been added to the form "Offer of Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment," a provision reserving to the Commissioner of Internal Revenue the right to later assert any deficiency he might determine the plaintiff owed, but this addition had been stricken before the offer was submitted. This is not true in the case at bar, but it is true that in consideration of the offer, the remaining balance of the previous assessment against plaintiff was abated. The agreements in the respective cases are, otherwise, identical in every material respect. Both contain provisions that the case will not be re-opened absent certain specified conditions, not found to have been present in the Guggenheim case, nor are they present in this case. If anything, this case presents even stronger ground for invoking the doctrine of equitable estoppel. At the time of the agreement, the period for collection of the balance of the assessments for fiscal 1941 had not expired, while at the time the private bill was introduced in 1957 collection of additional taxes was barred, the balance of the assessments having been abated and the time for making a new assessment having expired. The agreements having been executed in good faith, to allow plaintiff to renounce them now and to recover a refund would be both illegal and inequitable.

We, therefore, conclude that plaintiff has neither an equitable nor a legal claim against defendant with respect to taxes paid on account of the Birmingham contract.

There follows the findings of fact of the Trial Commissioner, which have been adopted by the court with only minor modifications. This opinion and findings of fact will be transmitted to the House of Representatives pursuant to Resolution 636 of the 85th Congress of the United States, Second Session.

It is so ordered.

JONES, Chief Judge, and DAVIS, DURFEE and LARAMORE, Judges, concur.