JOHN H. HUFFMEYER AND RITA HUFFMEYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Huffmeyer v. Commissioner
Docket No. 15248-79.
United States Tax Court
T.C. Memo 1987-48; 1987 Tax Ct. Memo LEXIS 48; 52 T.C.M. (CCH) 1487; T.C.M. (RIA) 87048; January 21, 1987. Charles J. Bondurant and James E. Monnig, for the petitioners. Ana G. Cummings and David W. Johnson, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1972
$11,306.85
1973
4,529.82
1974
1,921.12
1975
1,299.17
1976
1,666.00
The primary adjustments determined by respondent stem from petitioners' participation in two partnerships, Northwood Apartments, Ltd., and Northwood Stage II. The parties have entered into a stipulation as to procedures for disposition of the partnership *50 issues. [1] The issue for decision is whether proper consents were executed pursuant to section 6501(c)(4)[2] so as to extend the statute of limitations for petitioners' taxable years 1972 through 1975. Specifically, the limitations issue involves a "missing consent" [3] for 1972 and the authority of certain of respondent's agents to sign the other consents. There is no statute of limitations issue for 1976. FINDINGS *51 OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners resided in San Antonio, Texas at the time they filed their petition in this case. Petitioners timely filed joint individual income tax returns (Forms 1040) for their taxable years 1972 through 1976. Each of those returns was prepared by Donald E. Deal, who had been their certified public accountant for about 15 years. Those returns having been filed on or before April 15 each year, absent a valid extension, the ordinary three-year limitations period, section 6501(a), expired as follows: Year
Expiration Date
1972
April 15, 1976
1973
April 15, 1977
1974
April 15, 1978
1975
April 15, 1979
1976
April 15, 1980
The statutory notice of deficiency upon which this case is based is dated July 30, 1979; no notice of deficiency concerning these years was mailed to petitioners prior to that date. Accordingly, the notice was timely for petitioners' taxable year 1976 in any event. Petitioners and respondent executed Forms 872 (Consent Fixing Period of Limitation Upon Assessment *52 of Income Tax) for petitioners' taxable years 1972 through 1975, as follows: Date
Person Signing on
Taxable
Extension
Signed by
Respondent's
Date
Years(s)
to
Petitioners
Behalf
Signed
1972
12/31/77
11/05/76
Clarence H. Isbel
11/09/76
1973
12/31/77
11/05/76
Clarence H. Isbel
11/09/76
1972, 1973 12/31/78
11/11/77
Clemens Lux
11/21/77
1974
12/31/78
11/11/77
Clemens Lux
11/21/77
1972, 1973,
1974
7/31/79
7/12/78
Carol B. Keller
7/14/78
1975
12/31/79
10/11/78
Bobby L. Taylor
10/19/78
Clarence H. Isbel was a group manager in respondent's San Antonio District when he signed the consents in November of 1976, as was Carol B. Keller when he signed the July 1978 consent. Bobby L. Taylor also signed the October 1978 consent as a group manager. [4] Clements Lux, a senior revenue agent who had worked for the IRS since 1958, signed the November 1977 consents as acting group manager in Isbel's place pursuant to an oral designation by Isbel. Isbel had no assistant, and as a regular practice orally designated a senior revenue agent to act as group manager in his place whenever he [Isbel] was absent from *53 the office or otherwise unavailable. *54 Delegation Order No. 45-3 (Rev.), issued and effective May 7, 1975, redelegated to various officials, including group managers in audit, the authority of the Director of the Austin, Texas District to sign consents fixing the limitations on assessment or collection. Delegation Order AUS-55, issued and effective May 27, 1977, similarly redelegated the District Director's delegated signatory authority to group managers in audit. During the entire period in question, in respondent's San Antonio office, group managers in audit were duly authorized to execute on respondent's behalf consents extending the period of limitations for assessment. [5]
*55 Under its normal procedures, the Audit (Examination) Division of respondent's San Antonio office maintained a multiple copy set of "inventory control cards." These cards (Forms 1247) were duplicates containing information such as the taxpayer's name, address, social security number, taxable period, and statute of limitations date. These Forms 1247 were prepared as soon as a case came into the group. The group clerk (sometimes referred to as group secretary) maintained at least two copies of those "inventory control cards" for each return. One copy was maintained alphabetically with a file reflecting all the returns for the group (the alphabetical or continuous inventory file), while another copy was maintained in a file reflecting all the returns assigned each agent (the agent's inventory file). In addition to these two files, there was a third file, the "statute control card," which is the Form 5345 and which is prepared later by the group clerk. On a monthly basis, the group clerk reviewed the alphabetical card file (Forms 1247) and identified from those cards the returns on which the statute of limitations would expire within six months from the date of review. As a result *56 of this review, the group clerk then prepared a "statute control card" (Form 5345 or its predecessor) [6] showing the taxpayers' name, address, taxable year, and statute expiration date, including updates. The group clerk then filed the statute control card in a file organized by month and year of expiration. Also as result of this review, the group clerk then prepared a Form 895, Notice of Statute Expiration, a two-part form, filling in certain taxpayer information from the inventory control cards. Part I and Part II of the Form 895 were duplicate forms to the extent of lines 1-13, with a carbon in between, but the bottom portion (lines 14 and 15) were found only on Part II. The group clerk would then give both parts of the Form 895 to the revenue agent assigned to the case. *57 At all times pertinent to this case, and throughout all of 1976, Clarence Isbel, the group manager supervising the revenue agent assigned to petitioners' case, also regularly examined the "inventory control cards". He identified from the alphabetical card file of all the returns assigned to his group those returns which had an expiration date within six months. He then compared his list that he had independently made with the "statute control cards" prepared by the group clerk and verified that there was a "statute control card" for each of those returns. Once the revenue agent had received the Form 895 informing him of the statute of limitations problem, he had 30 days to obtain a consent executed by the taxpayers or the taxpayers' representative extending the limitations period or to explain to Isbel the reasons he had not been able to obtain the consent. If the statute for a case under audit was due to expire within 90 days, Isbel listed that case on a priority listing and closely supervised the agent's efforts to obtain a consent. As the time got shorter, Isbel actually kept the case file or the tax return on his desk to remind him of the consent problem. After he had *58 secured a consent, the revenue agent filled in a block on the Form 895 so indicating, signed his name, dated it, and returned both the consent and the Form 895 to the group clerk for further processing. [7] The group clerk then stamped on the consent the District Director's name, the group manager's title, and the date, and then presented Part I of the Form 895 and the consent form to the group manager for his signature. The group manager, Clarence Isbel, instructed his group clerk not to accept a Form 895 from a revenue agent unless the consent form was attached to it. *59 Before signing a consent on respondent's behalf, Isbel compared the information on the consent, including the taxpayer's signature, with the income tax return for which this consent had been secured. If he was satisfied that the documents were in order, he executed the consent form and returned it, along with Form 895 (Part I), to the group clerk. Once the group clerk received the executed consent back from the group manager, she attached Part I of the Form 895 to the "statute control card." In addition, the group clerk updated the statute control card and the card in the alphabetical file of inventory control cards to reflect the new statute of limitations date. Under the normal procedures of respondent's San Antonio office, the group clerk would not update the limitations date on these various control files without having in hand a consent executed by both the taxpayer (or his representative) and the group manager. After updating her various records to reflect the extended limitations period, the group clerk returned to the revenue agent the Government's copy of the fully executed consent form. This consent form was retained in the revenue agent's case file, usually attached *60 to the front or the back of the tax return itself. Usually, the group clerk mailed to the taxpayers (or their representative) their copy of the fully executed consent, under cover of a transmittal letter. A copy of the transmittal letter was retained in the revenue agent's case file. Sometimes, however, the revenue agent hand delivered the taxpayer's copy of the executed consent, in which case no transmittal letter was prepared. [8]
The procedures in respondent's San Antonio office for obtaining and processing subsequent consents were substantially identical to those described above. With a subsequent consent, however, the group manager (Isbel) compared the information and signatures on the new consent with the previous consent rather than with the tax return. Isbel would not sign a later consent if the previous one was not in the case file. In early 1976, Revenue Agent James DeVage was on assignment with the Taxpayers Assistance Program, with the result that his entire audit *61 schedule had slipped. Although he was apparently assigned petitioners' case in October of 1975, DeVage did not commence any action until January 20, 1976, when he received the Form 895 from the group clerk. DeVage knew that immediate action on his part was necessary to secure a consent, since the statute was expiring in less than 90 days. Had DeVage not tried to obtain a consent extending the statute of limitations, he would have had to immediately start the examination so that a statutory notice could be timely issued. DeVage also knew that this was a partnership case that was in audit in the Dallas office. DeVage immediately drafted a handwritten letter to petitioners asking them to execute the enclosed consent (Form 872) extending the limitations period for petitioners' taxable year 1972. When the consent had not been returned by February 13, 1976, DeVage telephoned the office of Dr. Huffmeyer (petitioner-husband herein), where a secretary directed him to contact petitioners' CPA, Donald E. Deal. DeVage then telephoned Deal, who told him that petitioners would sign the consent form for 1972 if it was limited to the partnership issues under examination in respondent's Dallas *62 office. DeVage could not make that decision and referred the matter to his group manager. Isbel, DeVage's group manager, would not agree to Deal's proposed limitation, and so advised Deal in a telephone call on February 17, 1976. The next day, on February 18, 1976, Deal informed DeVage by telephone that petitioners would execute and forward the consent. DeVage told Deal that since he (DeVage) was working on the Taxpayers Assistance Program, he would contact him for an appointment to begin the audit after April 15, 1976. Dr. Huffmeyer would never sign any document connected with his tax matters without first showing it to Deal and getting Deal's approval to sign. Deal would always advise his clients to execute consents to extend the limitations period. On February 20, 1976, DeVage completed and returned to the group clerk the Form 895 regarding petitioners' taxable year 1972. In block 10(a), DeVage checked "Consent Secured." In block 12 on the Form 895 labeled "Remarks," DeVage wrote the following: "TP signed consent to extend statute to 12/31/76." DeVage did not fill in block 11 of the Form 895, entitled "Expiration Date." See n.7, supra. Block 11 of Part I of the Form *63 895 for 1972 was marked "12-31-76," along with subsequent updates (12-31-77, 12-31-78, and 7-31-79) to reflect the November 1976, November 1977, and July 1978 consents. The Part I was maintained by the group clerk. Part II of that Form 895 was maintained in the revenue agent's file, and the only date marked in block 11 on his copy was 7-31-79. The inventory control card for petitioners' taxable year 1972 (Form 1247) clearly shows that the statute of limitations was extended to December 31, 1977 and December 31, 1978 (again reflecting the November 1976 and November 1977 consents). However, because of the practice of erasing or writing over the preceding date, it cannot be definitely ascertained from the original inventory control card, which is in evidence, whether it was ever marked to show an extension to December 31, 1976. [9] A Form 5345 Group Control Card for petitioners' taxable year 1972, used for statute of limitations control, shows a statute of limitations date of December 31, 1976. This Form 5345, however, was not developed until September 1977, and this particular form was prepared sometime after 1976 by transcribing information from either the predecessor form or from *64 the inventory control card (Form 1247). Because DeVage was assigned to the Taxpayers Assistance Program that year, he did not begin the audit of petitioners' returns until after April 15, 1976. On April 16, 1976, he contacted Dr. Huffmeyer to set up an appointment to begin the examination of the 1972 and 1973 years. On April 21, 1976, petitioners and Deal, their CPA, executed a Form 2848 (Power of Attorney) authorizing Deal to act as their attorney in fact for their taxable years 1972 and 1973. Over the next two years Revenue Agent DeVage and Deal were *65 engaged in an audit of those two years and of the years 1974, 1975, and 1976, the audit having been expanded to cover those later years. On June 30, 1978, petitioners executed a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) agreeing to deficiencies for each of the years 1972 to 1976. Petitioners agreed to a deficiency of $2,117.95 for their taxable year 1972. This waiver reflected petitioners' agreement to all of respondent's proposed adjustments except those related to the two partnerships. See n.1, supra. Respondent has assessed those deficiencies for the years 1972 to 1976. In July of 1978, after DeVage had completed his examination and the group manager had reviewed his report, the case file was sent to Austin, Texas for review. There was a prescribed way to assemble the file, and consents were attached to either the front or the back of the tax returns. The case came back from respondent's Austin office twice. When the case was returned the first time, DeVage responded to the reviewer's query and returned the file to Austin. The case was returned a second time, this time because the file did not *66 contain a consent for petitioners' taxable year 1972 extending the statute of limitations from April 15, 1976 to at least November 9, 1976, the "missing consent." DeVage searched all the records of his group and those of the group of Isbel, his previous group manager, in an unsuccessful effort to find the missing consent. In September of 1978, DeVage and his group manager, Carol Keller, contacted Deal to see whether he had the taxpayers' copy of the missing consent. [10] The taxpayers' copy could not be found in Deal's file. DeVage also contacted Dr. Huffmeyer's office and asked his secretary to check the doctor's files for the consent. That search too was unsuccessful. *67 Normally petitioners' tax records were maintained at Deal's office, but copies of some of the consents admittedly executed could not be located in Deal's office. Petitioners had moved three times during the intervening period. They had changed their residence address twice, and Dr. Huffmeyer's office address had changed once during the intervening period. Neither party has been able to produce either the original or the taxpayers' copy of the missing consent. See n.10, supra. Respondent was unable to produce any copy of a transmittal letter that would have accompanied any mailing to petitioners of their copy of the missing consent. See n.8, supra. Neither petitioners nor any of respondent's agents have any independent recollection of executing or processing the missing consent, nor do they specifically recall executing or processing any of the other consents that are in evidence. [11]
*68 Petitioners would not sign any document connected with tax matters without first showing it to Deal and getting his approval to sign. Generally, Deal advised petitioners to execute consents extending the statute of limitations when so requested by respondent's agents. Usually after meeting with Deal, Dr. Huffmeyer would take home the consent forms for Mrs. Huffmeyer to sign and then mail the forms directly to respondent's agent; sometimes, Deal might review the executed consent form before it was returned to respondent's agent. Deal would not ordinarily advise a client to execute a consent if the statute had already run. Deal's general practice was to check the prior consent before adivisng a client to sign a subsequent consent for the same year. Deal told DeVage that petitioners would execute the first consent for 1972. Dr. Huffmeyer does not recall executing the missing consent but he also does not recall that he did not execute it. See nn.6, 11, supra. Dr. Huffmeyer also does not recall executing the other consents in evidence that he signed. DeVage was not aware of the potential limitations problem for 1972 until the Austin office returned the file to the San Antonio *69 office for the second time, informing him at that time that the consent (for the period April 15, 1976 to at least November 9, 1976) was not in the file. Petitioners and Deal were not aware of the potential limitations problem for 1972 until DeVage contacted them looking for their copy of the missing consent. ULTIMATE FINDING OF FACT Petitioners and respondent executed a consent form before April 15, 1976, extending the limitations period for petitioners' taxable year 1972 until at least November 9, 1976, the date on which the second consent for that taxable year was executed by respondent's agent. OPINION Generally, respondent has three years from the filing of the return to determine and assess a taxpayer's liability. Sec. 6501(a). [12]Section 6501(c)(4), however, provides a mechanism by which the parties can agree to extend the ordinary limitations period.[13] Where, as here, the taxpayers have established that no statutory notice of deficiency was mailed to them before the ordinary three-year statute expired, respondent must come forward with countervailing evidence to show that the limitations period had not expired when he issued the statutory notice of deficiency. *70 Respondent may discharge this burden by introducing into evidence facially valid consents that extend the period for assessment up to mailing of the deficiency notice. Robinson v. Commissioner,57 T.C. 735, 737 (1972); Concrete Engineering Co. v. Commissioner,19 B.T.A. 212, 221-222 (1930), affd. 58 F.2d 566 (8th Cir. 1932). [14] If the taxpayer disputes the effectiveness of such consent, he must affirmatively prove its invalidity. Crown Williamette Paper Co. v. McLaughlin,81 F.2d 365 (9th Cir. 1936); Concrete Engineering Co. v. Commissioner,supra.[15] In particular, petitioners must prove their claim that the persons signing the consents on respondent's behalf lacked the authority to do so. Concrete Engineering Co. v. Commissioner,supra,19 B.T.A. at 221. [16]
*71 Citing United States v. Cook,494 F.2d 573 (5th Cir. 1974) and Rohde v. United States,415 F.2d 695 (9th Cir. 1969), petitioners argue that none of the six consents in evidence is valid because none was signed by the District Director personally. Both the Cook and Rohde cases involved the question of when, if ever, an agreement under section 6502(a)(2)[17] becomes effective to extend the limitations period for the Government to commence an action to collect a timely assessed tax liability. The issue was whether it became effective upon execution by the taxpayers or upon execution by the District Director. Both cases held that the agreement became effective only when the District Director executed the consent form. In Rohde v. United States,supra, the consent was never executed by anyone for the Government. In United States v. Cook,supra, the consent was executed by the District Director, but the crucial question was whether it was his execution or the taxpayer's execution of the consent that was operative; in the latter case, the Government's suit was timely but in the former case it was not. Neither *72 case held that the District Director himself must personally execute the consent. The Rohde case contemplated some delegation of signatory authority (415 F.2d at 698) stating: It [consent form] recites acceptance of the waiver by the Commissioner's delegate, states that the offer in compromise will be considered, and provides a signature line for the Commissioner's delegate. Both the Code and the Regulations clearly provide for the delegation of authority to sign section 6501(c)(4) consents on respondent's behalf. Sec. 6501(c)(4) (see n.13, supra); secs. 7701(a)(11), 12(A); [18] sec. 301.6501(c)-1(d), Proced. & Admin. Regs.; [19]sec. 301.7701-9, Proced. & Admin. Regs. [20] The governing delegation orders, nationally and locally, clearly authorize a group manager in audit to execute Forms 872 on respondent's behalf. Del. Ord. No. 42 (Rev. 6), 1975-1 C.B. 635; Del. Ord. No. 42 (Rev. 7), 1977-1 C.B. 527; Del. Ord. No. 42 (Rev. 8), 1978-2 C.B. 469; Del. Ord. No. 42 (Rev. 9), 1978-2 C.B. 469; Del. Ord. No. 42 (Rev. 10), *73 1978-2 C.B. 469. See also Austin District Del. Ord. No. 43-5 (Rev.) and Del. Ord. No. AUS-55, discussed in the findings of fact, supra. These consents do not require the signature of the District Director himself to be valid, and the consents signed by a group manager in this case are valid.
*74 Petitioners also dispute the validity of the November 1977 consents for their taxable years 1972, 1973, and 1974. These consents were signed for respondent by Clemens Lux, a senior revenue agent serving as acting group manager pursuant to an oral designation by Clarence Isbel, the group manager. Petitioners contend that this was an improper "redelegation" of Isbel's authority. We disagree. It was exactly what it purported to be, a designation of Lux as acting group manager. See paragraph 1 of Delegation Order No. 12 (Rev. 6), quoted below, which permits the designation of an employee as acting. Petitioners further argue that a written designation was necessary for Lux to have authority to execute the consents on respondent's behalf. In Sanderling, Inc. v. Commissioner,66 T.C. 743, 753-755 (1976), affd. on this issue 571 F.2d 174 (3d Cir. 1978), we held that an oral designation to serve as acting group supervisor (manager) was sufficient to confer authority on the designate to execute the disputed consent. [21] We quoted the effective delegation orders authorizing IRS supervisors to designate an employee to serve as acting during their absence, *75 noting that the orders (Del. Ord. No. 12 (Rev. 4 and 5)) did not require the designation to be written. Here, by contrast, the delegation order does seem to require a written designation. Delegation Order No. 12 (Rev. 6), effective June 14, 1976, provides, in pertinent part: 1. All Internal Revenue Service employees in supervisory positions other than positions specifically provided for in Sections 2 through 9 of this Order are authorized to designate an employee to serve as acting during their absence and, in case a supervisory position under their supervision and control becomes vacant, to designate an employee to serve as acting. * * * 10. All designations as acting shall be made in writing and retained as a record, and a record shall be maintained of the periods during which an official automatically became acting under the provisions of this delegation order or by automatic designations issued under authority of this delegation order. The loss of such records, or the failure to maintain such records, will not invalidate the authority of the individual acting pursuant to this delegation order. *76 Although this Delegation Order contemplates a written designation, the second sentence of paragraph 10 (stating that the loss of recrds or failure to maintain recores does not invalidate a designate's authority) indicates that this provision is merely for respondent's own internal use and was not intended to confer any substantive rights upon taxpayers. As such, this provision is directory rather than mandatory, and the failure of respondent's subordinates to comply with this procedural directive does not invalidate the consents signed by Clemens Lux. See United States v. Horne,714 F.2d 206, 207 (1st Cir. 1983); Rosenberg v. Commissioner,450 F.2d 529, 532 (10th Cir. 1971), affg. a Memorandum Opinion of this Court; Cleveland Trust Co. v. United States,421 F.2d 475 (6th Cir. 1970), cert. denied 400 U.S. 819 (1970); Luhring v. Glotzbach,304 F.2d 560 (4th Cir. 1962); Collins v. Commissioner,61 T.C. 693, 701 (1974). See also Einhorn v. DeWitt,618 F.2d 347, 350 (5th Cir. 1980). See generally Saltzman, IRS Practice and Procedure, pars. 1.03[2][c], 3.02[4][c], *77 pp. 1-38 through 1-41 and 3-12 through 3-14 (1981). As we stated in Wessel v. Commissioner,65 T.C. 273, 276 (1975), and quoted with approval in Sanderling, Inc. v. Commissioner,supra,66 T.C. at 754: [W]e are not prepared to exact the burdensome formalistic detail of requiring a written designation to acting supervisory personnel each time the incumbent of the position temporarily absents himself. We also reject petitioners' contention that the October 1978 extension for 1975 is invalid. That consent showed as signator on respondent's behalf one Bobby L. Taylor, group manager. As stated above, the group managers were properly delegated authority to sign the consents. Petitioners have not offered anything to show that this facially valid consent was ineffective. See n.4, supra.Concrete Engineering Co. v. Commissioner,supra.
Finally, there is the matter of the "missing consent" for 1972, the one that extends the statute of limitations from April 15, 1976 until at least November 9, 1976, the effective date of the first executed consent in evidence. *78 Where no copy of an executed consent is available, respondent may nevertheless carry his burden by establishing through secondary evidence the existence and timely execution of the consent. United States v. Conry,631 F.2d 599 (9th Cir. 1980); Eclipse Lawn Mower Co. v. United States,76 Ct. Cl. 354, 1 F. Supp. 768 (1932); Marquis v. United States,348 F. Supp. 987 (C.D. Cal. 1972), affd. in an unpublished opinion (9th Cir. 1974).[22]
Only an original (respondent's copy) and one copy (the taxpayer's copy) of a consent form (Form 872) are prepared. See n.10, supra. In this case neither respondent's original nor petitioners' copy could be located. At trial respondent devoted much effort to establish the ordinary procedures in his San Antonio office during 1976 in regard to obtaining and processing consent forms. His purpose in so doing was to show various internal documents reflecting a later limitations date (12-31-76 rather than 4-15-76), documents that would only have been prepared *79 if a consent had in fact been obtained. Similarly, petitioners devoted much effort to try to show discrepancies and failures to follow those ordinary procedures. Their purpose in so doing was to persuade us that no such consent form was ever executed by petitioners and by respondent's agent. All of the witnesses for both parties candidly admitted they had no independent recollection of signing or processing either the missing consent or the executed consents that are in evidence. The record is largely composed of various documents and the conflicting inferences each side asks us to draw from these pieces of paper. We have made detailed findings of fact as to the procedures and the various records maintained, and we need not repeat that material here. Suffice it to say, despite some minor inconsistencies, we are persuaded, based on the record as a whole, that the missing consent form in fact existed, was executed by respondent's agent before April 15, 1976, and extended the limitations period at least to November 9, 1976, the date the second consent form for 1972 was executed by respondent's agent. We will state as briefly as possible the basis for the above ultimate finding *80 of fact. Despite some minor inconsistencies in the documentation, the major actions of both parties were not only consistent with the existence of such a consent form but would have been wholly inconsistent and illogical if the consent form had not been obtained. First, despite the doubts petitioners try to inject about the various statute control systems in operation at the San Antonio office, particularly in regard to the Form 895, the fact remains that Revenue Agent DeVage checked Block 10(a) on that form ["Consent Secured"] and personally wrote in Block 12 "TP signed consent to extend statute to 12/31/76." Thus, all of the speculation about who wrote "12-31-76" in Block 11 is interesting but not particularly helpful. Petitioners' speculation that DeVage did not really have the consent and merely expected to receive it in the next few days has no support in the record at all.Petitioners' further speculation that the group clerk wrote "12-31-76" in Block 11 without ever seeing a consent form also has no support in the record. What DeVage wrote on the Form 895 was not conditional, anticipatory, or written in the future tense. He did not write: "TP will sign consent, *81 " and the Court has no reason to read it that way. DeVage testified that he would not have written what he did if he had not had the signed consent from the taxpayers in his hand. The Court found DeVage to be a wholly credible witness, and believed his testimony. Given DeVage's knowledge of the importance of the consent form, the Court does not believe he would have checked "Consent Secured" and written "TP signed consent to extend statute to 12/31/76" if he had not in fact had the consent in hand. Moreover, petitioners' proposed scenario requires not only a flat misstatement on the Form 895 by DeVage, but failure on the part of the group clerk to follow the group manager's instructions not to accept a Form 895 from a revenue agent without the consent being attached thereto. Petitioners' scenario also posits a failure of the group manager to follow his practice of closely monitoring cases in which the statute was soon to expire and keeping the case file or tax return on his desk in order to do so. Speculation as to who inserted "12-31-76" in Block 11 of the Form 895 (see n.7, supra) and the fact that because of the practice of erasing or writing over earlier dates, it cannot *82 be determined conclusively that "12-31-76" was written under the "12-31-77" and "12-31-78" on the inventory control card (see n.9, supra) do not persuade us that the revenue agent, the group clerk, and the group manager all failed to perform their duties properly. Moreover, the actions of both parties were only consistent with the existence of the consent. Petitioners' CPA, Deal, always advised his clients to sign the consent and told DeVage that petitioners would do so. DeVage told Deal he would contact him after April 15, 1976, when his Taxpayers Assistance work was completed, to set up an appointment to begin the audit. On April 16, 1976, one day after the statute would have expired absent a consent extending the limitations period, DeVage contacted Dr. Huffmeyer to set up an appointment for that purpose. Dr. Huffmeyer and his wife then executed a power of attorney so Deal could handle the audit. That power of attorney was executed on April 21, 1976, just six days after the statute would have expired had the consent not been executed. For the next two years DeVage and Deal were engaged in the audit which was expanded to cover the years 1972 through 1976. During that two-year *83 period petitioners executed three more consents extending the limitations period for 1972. Dr. Huffmeyer testified he would not sign any document without showing it to Deal and getting his approval to sign. Deal testified he would not have had his client sign another consent if the statute had already run, and that his general practice was to check prior consents before advising his client to sign another consent. Similarly, the group manager, Clarence Isbel, testified that when any subsequent consent came in for his signature he always checked it against the prior consent before signing it. Furthermore, in June of 1978 petitioners agreed to the assessment of deficiencies for each of the years 1972 through 1976, and a deficiency of $2,117.95 was assessed for 1972. Neither petitioners nor DeVage were aware of any potential limitations problem until July of 1978.At that time respondent's Austin office returned the case file to San Antonio for the second time, this time because of the "missing consent." DeVage could not locate respondent's original and went to Deal and petitioners to try to locate the taxpayers' copy, which also could not be located. The Court thinks it is inconceivable *84 that petitioners, well represented by a qualified tax professional, would have undertaken a two-year course of negotiation and audit and actually consented to an increased deficiency for 1972 unless there was a valid initial extension of the limitations period for that year. For all of the foregoing reasons, the Court concludes that the missing consent was in existence and had been properly executed. Accordingly, respondent's deficiency notice was timely for all of the years at issue. An appropriate order will be entered.
Footnotes
1. The parties have agreed that, failing settlement, the evidence introduced in the case of Coit v. Commissioner,↩ docket No. 5750-78, will be incorporated into the record in this case, to the extent applicable to the two partnerships here in issue. Respondent's statutory notice also made several other adjustments, which petitioners have conceded. 2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. We use the term "missing consent" solely for convenience. By this usage, we do not assume that such a consent ever existed, this being the principal factual issue in dispute.↩
4. In their reply brief, petitioners for the first time question whether Bobby L. Taylor was a group manager. However, he signed as group manager just as Clarence H. Isbel and Carol B. Keller did. The consent is valid on its face, and petitioners have the burden to establish that it was invalid. Cindrich v. Commissioner,T.C. Memo. 1984-294, affd. without published opinion 770 F.2d 1067 (3d Cir. 1985); Lefebvre v. Commissioner,T.C. Memo. 1984-202, affd. per curiam 758 F.2d 1340 (9th Cir. 1985). There is nothing in the record to suggest that Bobby L. Taylor was not a group manager when he signed the consent as group manager. The Court notes that when Lux signed as acting group manager, the form read "For: Group Manager." More importantly, in his opening statement at the commencement of the trial, petitioners' counsel advised respondent and the Court that the only issue for the taxable year 1975 was a legal issue as to whether or not, under United States v. Cook,494 F.2d 573 (5th Cir. 1974), the consent had to be signed on behalf of respondent by the District Director himself. The Court will not consider any new issue raised for the first time on brief. The petition in this case raised no limitations issue as to 1975, but the Court will consider the Cook↩ issue as one tried by agreement of the parties. Rule 41(b)(1).
5. Delegation Order AUS-55 makes reference to a Delegation Order No. 45-3 (Rev. 9), issued November 12, 1976, that respondent did not offer into evidence. Nonetheless, since the governing delegation orders during this period from the Commissioner authorized the District Director to redelegate signatory authority to group managers in audit (See Del. Ord. No. 42 (Rev. 6), 1975-1 C.B. 635; Del. Ord. No. 42 (Rev. 7), 1977-1 C.B. 527↩), and the Austin District Director's prior and subsequent delegation orders redelegated such signatory authority to group managers in audit, we concluded that these group managers possessed signatory authority throughout the entire period in question. Also Mr. Isbel's testimony clearly established that to be the fact.
6. The example of this form for the 1972 taxable year that is in the record is a Form 5345 (Rev. 9-77), a version used subsequent to the pertinent date in this case. The forms were changing in the period from October 1976 through 1977 because of implementation of the AIMS System, with the result that the documentation in this case is a mix of forms from different periods. However, the Court has accepted the testimony of a group clerk who worked as such both before and after but not during this period, and the group manager, Clarence Isbel, as to the broad outline of the system and procedures. In view of Isbel's long experience as a group manager and familiarity with the system, the Court has placed particular reliance on his testimony, which the Court found credible. Petitioners complain that the group clerk was not the group clerk who served as such during the period 1976-1977. However, the Court accepts her testimony as to the general system and practice. While it obviously would have been better had the particular group clerk been called to testify, the Court would have been rather astonished had such individual had any independent recollection of the events. None of the witnesses in this case, including Dr. Huffmeyer himself, had any independent recollection of signing and/or processing any of the consents.↩
7. The testimony of the revenue agent and the group clerk was conflicting on certain minor details of this stage of the proceeding. The revenue agent testified that he returned both Part I and Part II of the Form 895 to the group clerk who marked in block 11 on the form the extended limitations date and then returned Part II to the agent for his case file. The group clerk testified that the revenue agent noted in block 11 on the Form 895 the extended limitations date and then gave her only Part I of the form for further processing. These minor inconsistencies can be explained by the fact that the revenue agent's recollection at trial was admittedly not too clear about the detailed procedures in effect some eight years earlier. Also the group clerk who testified about the general office procedures was not the specific clerk who worked in that group in 1976. See n.6, supra.↩ The Court does not regard this possibly conflicting testimony as critical one way or the other in this particular case. It is clear that the revenue agent personally checked block 10(a) [Consent Secured] and personally wrote in block 12 "TP signed consent to extend statute to 12/31/76." Whether he or the group clerk wrote "12-31-76" in block 11 [Expiration Date] is unimportant. It was written in block 11 after Part I and Part II had been separated, because it does not appear on the Part II portion retained by the revenue agent.
8. Of the six Forms 872 in evidence that admittedly were executed by both petitioners and respondent, the record shows a copy of a transmittal letter only for the Form 872 for the 1975 taxable year.↩
9. In updating the statute of limitations date on the inventory control card, the group clerk would either erase the previously noted extension date or superimpose the new over the old. The original inventory control card for petitioners' taxable year 1972 quite clearly shows the year "78" with an 8 superimposed over a prior 7. It is also possible that the "78" and "77" were superimposed over a prior "76." There are no obvious signs of erasure on the original inventory control card submitted in evidence, but since the date and the superimposed figure are written in pencil, there may have been an erasure of an earlier "6."↩
10. Throughout the trial, the Court was struck by the peculiar fact that despite the various controls and files respondent set up to monitor the statute of limitations, respondent's practice was to make only the original and one copy (the taxpayers' copy) of a consent form. Thus, the original Form 872 would be the only copy respondent would have, and the taxpayers' copy would be the only other copy extant unless the taxpayers for some reason chose to make copies of their copy. Deal did not have a copying machine in his office, and hence made few copies of anything. Although respondent had only the original and no copies of the Form 872, there was no central file for Forms 872 and no central log to receipt for Forms 872. The original Forms 872 were simply attached to the front or back of the tax returns and trundled around with the case file from place to place, the case file here making two separate journeys from San Antonio to the Austin office for review. It is astonishing that the Court does not see more of these "missing consent" cases.↩
11. The Court did not find this lack of independent recollection unusual, particularly for respondent's agents who handled many consents in the normal performance of their duties. Since execution of a consent is an unusual event for an individual taxpayer, it would be more likely that Dr. Huffmeyer would recall whether he did or did not execute the consent. However, he testified, and the Court believed him, that he could not remember one way or the other, and that he could not even remember signing the consents he admittedly executed.↩
12. Section 6501(a) provides: (a) General Rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
13. Section 6501(c) provides in pertinent part: (c) Exceptions. -- * * * (4) Extension by Agreement. -- Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. ↩
14. See also Cindrich v. Commissioner,T.C. Memo. 1984-294, affd. without published opinion 770 F.2d 1067 (3d Cir. 1985); Lefebvre v. Commissioner,T.C. Memo. 1984-202, affd. per curiam 758 F.2d 1340 (9th Cir. 1985); Bridges v. Commissioner,T.C. Memo. 1983-763; Schenk v. Commissioner,T.C. Memo. 1976-363↩. 15. See also Parsons v. Commissioner,T.C. Memo. 1984-333; Cindrich v. Commissioner,supra;Lefebvre v. Commissioner,supra.↩
16. See also Bridges v. Commissioner,supra.↩
17. Section 6502(a) provides: (a) Length of Period. -- Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun -- (1) within 6 years after the assessment of the tax, or (2) prior to the expiration of any period for collection agreed upon in writing by the Secretary and the taxpayer before the expiration of such 6-year period (or, if there is a release of levy under section 6343 after such 6-year period, then before such release). The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. The period provided by this subsection during which a tax may be collected by levy shall not be extended or curtailed by reason of a judgment against the taxpayer. ↩
18. Section 7701(a) provides in pertinent part: (a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof -- * * * (11) Secretary of the Treasury and Secretary. -- (A) Secretary of the Treasury. -- The term "Secretary of the Treasury" means the Secretary of the Treasury, personally, and shall not include any delegate of his. (B) Secretary. -- The term "Secretary" means the Secretary of the Treasury or his delegate. (12) Delegate. -- (A) In general. -- The term "or his delegate" -- (i) when used with reference to the Secretary of the Treasury, means any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context; and (ii) when used with reference to any other official of the United States, shall be similarly construed. [Emphasis added.] ↩
19. Section 301.6501(c)-1(d), Proced. & Admin. Regs., provides: (d) Extension by agreement. The time prescribed by section 6501↩ for the assessment of any tax (other than the estate tax imposed by chapter 11 of the Code) may, prior to the expiration of such time, be extended for any period of time agreed upon in writing by the taxpayer and the district director or an assistant regional commissioner. The extension shall become effective when the agreement has been executed by both parties.The period agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. 20. Section 301.7701-9, Proced. & Admin. Regs., provides, in pertinent part: (a) The term "Secretary or his delegate" means the Secretary of the Treasury, or any officer, employee or agency of the Treasury Department duly authorized by the Secretary (directly, or indirectly by one or more redelegations of authority) to perform the function mentioned or described in the context, and the term "or his delegate" when used in connection with any other official of the United States shll be similarly construed. (b) In any case in which a function is vested by the Internal Revenue Code of 1954 or any other statute in the Secretary or his delegate, and Treasury regulations or Treasury decisions approved by the Secretary or his delegate provide that such function may be performed by the Commissioner, assistant commissioner, regional commissioner, assistant regional commissioner, district director, director of a regional service center, or by a designated officer or employee in the office of any such officer, such provision in the regulations or Treasury decision shall constitute a delegation by the Secretary of the authority to perform such function to the designated officer or employee. If such authority is delegated to any officer or employee performing services under the supervision and control of the Commissioner, such provision in the regulations or Treasury decision shall constitute a delegation by the Secretary to the Commissioner of the authority to perform such function and a redelegation thereof by the Commissioner to the designated officer or employee. (c) An officer or employee, including the Commissioner, authorized by regulations or Treasury decision to perform a function shall have authority to redelegate the performance of such function to any officer or employee performing services under his supervision and control, unless such power to so redelegate is prohibited or restricted by proper order or directive. The Commissioner may also redelegate authority to perform such function to other officers or employees under his supervision and control and, to the extent he deems proper, may authorize further redelegation of such authority.↩
21. See also Cindrich v. Commissioner,supra.↩
22. See also Mantzel v. Commissioner,T.C. Memo, 1981-169; Peters v. Commissioner,T.C. Memo. 1978-219↩.